IN THE MATTER OF PROBATE OF WILL OF ANNA L. BARRY.

*Opinion filed December 20, 1905—Rehearing denied Feb. 20, 1906.*

1. WILLS—*proponents not limited in circuit court to testimony of subscribing witnesses.* On appeal to the circuit court from an order of the county court denying probate the proponents are not limited to the testimony of the subscribing witnesses.

2. SAME—*affidavits of subscribing witnesses in county court may be proven by proponents to contradict their testimony.* Proponents of a will are required by law to produce the subscribing witnesses in the circuit court, if alive and sane and within the jurisdiction of the court, and hence may prove the affidavits of such witnesses made in the county court, for the purpose of contradicting their testimony as given in the circuit court, where there is conflict.

3. SAME—*what is not essential to valid attestation.* It is not necessary for a testatrix to state or for the subscribing witnesses to know that the instrument which they attested was her will nor for her to acknowledge to them that she had signed it, it being sufficient if she acknowledged to them, either by words or acts, that the instrument was her act and deed.

4. SAME—*what necessary to cast burden of proving absence of fraud upon one standing in confidential relation.* In order to cast upon one standing in confidential relationship to the textatrix the burden of proving the absence of fraud or undue influence in making the will, such person must be shown to have been directly connected in some manner with the making of the will, and it is not enough to show that he was present in the house when the will was executed.

APPEAL from the Circuit Court of Brown county; the Hon. A. AKERS, Judge, presiding.

JEFFERSON ORR, MATTHEWS & ANDERSON, J. F. REGAN, and LEON ORR, for appellants.

R. E. VANDEVENTER, and VANDEVENTER & WOODS, for appellee.

Per CURIAM: The county court of Brown county refused to probate the instrument in controversy as the last will and testament of Anna L. Barry, and an appeal was taken to the circuit court of that county from the order

of the county court denying the petition for probate. The law is well settled that upon the trial in the circuit court of an appeal from an order of the county court refusing to probate a will, the proponents may prove the execution of the will and the sanity of the testator by any evidence competent to establish a will in chancery, and that while they are required to produce the subscribing witnesses, if alive and sane and within the jurisdiction of the court, they are not limited to or necessarily bound by the testimony of the subscribing witnesses. *Webster* v. *Yorty,* 194 Ill. 408; *Illinois Masonic Orphans' Home* v. *Gracy,* 190 id. 95; *Thompson* v. *Owen,* 174 id. 229; *Crowley* v. *Crowley,* 80 id. 469.

The only question relating to the formal execution of the will in controversy between the parties is whether or not the subscribing witnesses saw the testatrix sign the will at the time of its execution, or, if they did not, whether or not she acknowledged the same to them to be her act and deed at the time when they signed as attesting witnesses.

At the time when the will was executed there were present in the library of the home of the testatrix, the two subscribing witnesses, DeWitt and Test, the testatrix herself, and William Mumford, the husband of the only daughter of the testatrix and the father of her grandson, Barry Mumford, who is her principal devisee. In certain contingencies William Mumford would take part of the property under the will, and he was not a competent witness and did not testify as to what occurred when the will was executed. The evidence shows he took no part in what was said and done in the library while the subscribing witnesses were present.

The evidence shows that the will was typewritten, but that certain words therein were written with a pen in the handwriting of the testatrix. In the clause of the will providing that if Barry Mumford should die during the lifetime of the testatrix the devises made for his benefit should go to his parents "in the following proportions, that is to say," the testatrix wrote with a pen the words "and Nellie

Price" after the word "parents," and the words "one-third
to each" after the words "that is to say."   There was a full
attestation clause at the end of the will after the signature
of the testatrix, such attestation clause being dated October
6, 1903, and reciting fully those facts necessary to consti-
tute the valid execution of a will, and showing that the will
was signed by the testatrix in the presence of the subscrib-
ing witnesses and acknowledged by her to them to be her last
will and testament.   Below the attestation clause is the word
"witnesses" on the left side of the page, and the word "res-
idence" on the right side of the page, and underneath ap-
pear the names of the subscribing witnesses, M. L. DeWitt
and Ellsworth E. Test, opposite the name of the latter being
his residence, "Mt. Sterling, Brown Co., Ill."

M. L. DeWitt, one of the subscribing witnesses, testified
that in the early part of October, 1903 he called at the home
of the testatrix to deliver some milk and butter, and that
Cora Scherrer, a domestic in the home of the testatrix, called
him into the house, and that he went into the library where
the testatrix was, the other subscribing witness, Ellsworth
Test, coming in soon afterward;  that the testatrix was sit-
ting at the desk writing on this paper, (meaning the will,)
and after Test had come in said that she wanted "us fel-
lows" to sign some papers for her;  that he, the witness,
was sitting some four or five feet from the desk, and that
she asked him to sign that, whereupon Test said something
about his father telling him to be careful about signing pa-
pers, and she said it was some of her own affairs;  that she
was writing on the paper she asked the witness to sign, and
that he signed that paper, at her request, below the word
"witness;"  that he saw the word "witness" when he signed
his name, and saw the name of the testatrix, Anna L. Barry,
when he signed his name, and that the testatrix was of
sound mind at the time when all this was done.   This wit-
ness, on being asked to state how the paper was folded when
he signed the same as a witness, folded the paper so as to

cover the attestation clause and the signature of testatrix, leaving the word "witness" visible, and thus exhibited the paper to the court. The witness DeWitt was living on the farm of testatrix as a tenant at this time, and occasionally called at the home of the testatrix on business connected with the farm.

Test, the other subscribing witness, was a young man rooming at the home of the testatrix and choring about the house and barn a great part of the time. This witness stated that he felt an interest in the proceeding that the will should not be probated; that he had no pecuniary interest in the matter, but that he thought the estate should be equally divided, affirming, however, that this feeling would not affect his testimony. He admits that soon after the will was offered for probate he left the home of the testatrix, feeling that it was not his place to remain there any longer, but declined to say that he and Mrs. Mumford, the daughter of the testatrix, had no unkind words at parting.

The subscribing witness Test swore on the trial that on the occasion in question Cora Scherrer called him, saying that Mrs. Barry wished him to witness some papers for her, and that he went into the library where she was, and found the witness DeWitt sitting there, and William Mumford in the room still farther away; that Mrs. Barry was at the desk, supposed to be writing, and that she got up from the desk and asked DeWitt and himself to sign some papers for her, and that they did so; that she told him to put his address after his name, and that he complied with this request; that he saw the words "witness" and "residence" on the paper when he signed his name; that he did not see the testatrix write a single letter when at the desk, but that she had a pen in her hand, and the instrument in question was lying on the desk just before she asked the witness to sign it; that the testatrix was of sound mind at the time; that after DeWitt and himself had signed their names he made the remark, in a joking way, that they would have to watch

the lawyers or they might get them to sign something they ought not to sign, and that she said it was a private matter of her own; that he did not see the name of the testatrix, and that he thinks the paper was folded so that he could not see her name.

Both of the subscribing witnesses state that they did not read the attestation clause or hear it read. Both of them identified the instrument in question as the one signed by them on the occasion to which they testified. There was an abundance of evidence, aside from the testimony of these two witnesses, that the signature of the testatrix is her genuine signature, and this point is not controverted.

The evidence also shows that the testatrix had made a will on a former occasion and must have known the requisites to the proper execution of a will; that she was a strong-minded woman; that on the same day on which the will was made she wrote an instrument and signed the same, calling it a codicil to her will that day made, and that a year afterwards, and about three days before she died, she told the witness Mrs. Stubblefield that she had made a will, and gave her the substance of the provisions of the instrument in question and the reason why she had left nothing whatever to her granddaughter, Nellie Barry.

The affidavits of the subscribing witnesses, filed in the county court, were admitted in evidence, and it appears from these affidavits that each of the subscribing witnesses swore in the county court that before he signed as a witness he saw the testatrix writing on the instrument in question, and that he subscribed his name to the will as one of the subscribing witnesses at the request of the testatrix, and in her presence and in the presence of the other subscribing witness. The proponents were compelled to call the subscribing witnesses to the witness stand, for which reason the affidavits made by them in the county court were proper evidence for the purpose of contradicting their testimony. *Thompson* v. *Owen, supra.*

Even if the subscribing witnesses did not actually see the testatrix sign the will, the evidence shows quite conclusively that she did at least acknowledge the same to them to be her act and deed, and that they thereupon, at her request, signed the same as subscribing witnesses. In *Gould* v. *Chicago Theological Seminary*, 189 Ill. 282, it is said (p. 292) : "It is not necessary that the attesting witnesses see the signature of the testator upon the face of the will, that they know the instrument they are witnessing to be a will, or that an acknowledgment of the signature be made to them by the testator. The statutory requirement is satisfied if the testator acknowledge the execution of the will. And such acknowledgment need not be in language. Any act, sign or gesture of the testator will suffice which indicates an acknowledgment of the will with unmistakable certainty." Nor is it necessary that in the acknowledgment of the instrument it should be called a will or that the subscribing witnesses should know that the instrument is a will. (*Webster* v. *Yorty, supra.*) Neither is it necessary that there should be an attestation clause, but it is sufficient if the witnesses sign as attesting witnesses in the manner and under the circumstances required by the statute. And so it was not necessary for Anna L. Barry to state, or for the subscribing witnesses to know, that the instrument in question was her will, nor was it necessary for her to acknowledge to them that she had signed it, but it was sufficient if she acknowledged to those witnesses, either by words or acts, that the instrument in question was her act and deed. *Illinois Masonic Orphans' Home* v. *Gracy, supra.*

The testatrix had made a will before, which had been executed as required by law. The instrument in controversy had been typewritten, and she had made changes in it in her own handwriting, showing that she had given the matter careful consideration. Attached to the instrument was an attestation clause, reciting that the witnesses saw her sign the will and that she acknowledged the same to be her last

will and testament, and setting forth all the other formalities required by statute in the execution of a will. Presumably she had read the attestation clause, and knew that the word "witnesses" was at the bottom of the clause. She instructed the domestic to tell DeWitt and Test to come into the room, telling her to tell Test that she wanted him to sign a paper. After writing on this instrument, or, at least, having her pen in hand with the instrument lying before her on the desk, she told the witnesses that she wanted them to sign some papers for her, asking one of them to write his residence after his name. She got up from the desk, and the witnesses signed their names under the word "witnesses," and Test wrote his residence after his name. Either before or after the witnesses signed something was said about being careful as to signing papers, or about watching that the lawyers did not get them to sign something they ought not to sign, and the testatrix answered that it was some of her own affairs, according to one witness, or that it was a private matter of her own, according to the other. What was the meaning of all this? Surely not that the testatrix was having the witnesses sign an obligation to her, or write their names for mere practice in penmanship, or for some other useless purpose. The above facts are reconcilable with one conclusion, and one only, and that is, that the testatrix called for DeWitt and Test to witness her will, and acknowledged the same to them to be her act and deed in full compliance with the requirements of the statute upon that point, whereupon the attesting witnesses signed the attestation clause in the presence of the testatrix and of each other, and at her request.

It is further contended on the part of the contestants that the will in question is the product of undue influence over the testatrix on the part of William Mumford. Evidence was introduced to show that William Mumford made a trip almost every month from his home in Pittsfield to the home of the testatrix in Mt. Sterling for the purpose of transacting her business for her, and that he was her confidential and

professional adviser as well as her son-in-law. There is no evidence in the record, however, to show that William Mumford had anything whatever to do with the preparation or execution of the will in question. He was present in the library when the will was executed, but took no part therein, either by word or act. After the will was executed the testatrix sent it to the bank, sealed up in an envelope with other papers, and there it remained for about a year and until after her death. There is no evidence to show any effort on the part of William Mumford to influence the testatrix to make a will, or to favor his son, Barry, in the disposition of her property. In cases in which the burden of proof is thrown upon one standing in a confidential relationship to show the absence of fraud or undue influence in the making of a will, such person must be shown to have been directly connected in some manner with the making of the will. The record fails to show that William Mumford was connected in any manner with the execution of the will. Any suspicion which might be engendered by Mumford's presence in the library when the will was executed cannot be regarded as proof of any such alleged fact. On the contrary, the declarations of the testatrix are in evidence to the effect that William Mumford did not write the will and that he had nothing to do with it.

When the will was made the testatrix had one living child, the wife of William Mumford, and two grandchildren, one of them Barry Mumford, child of William Mumford and wife, and the other, Nellie Barry, child of a deceased son of the testatrix. The bulk of the property disposed of by the will of the testatrix came to her from her husband, who had died on May 8, 1902. Nellie Barry's mother had secured a divorce or separate maintenance from her husband, the son of the testatrix, and Nellie had remained with her mother, though visiting the testatrix occasionally. Nellie's father had gone home to his mother, the testatrix, where he died in January, 1903. The will was made in October fol-

lowing. It is probable that this divorce proceeding, and the feeling engendered by it, had something to do with the act of the testatrix in leaving Nellie out of her will. However that may be, the testatrix had the right to dispose of her property as she saw fit, and there is no sufficient evidence in the record to show that her will was not freely, voluntarily and understandingly made, without the advice or persuasion of any person whomsoever. The charge of undue influence has not been established.

The order of the circuit court is reversed and the cause is remanded to that court with directions to enter an order admitting the will to probate.

*Reversed and remanded, with directions.*