WILLIAM H. H. SEARS

*v.*

MARGARET C. VAUGHAN *et al.*

*Opinion filed October 23, 1907—Rehearing denied Dec. 5, 1907.*

1. DEEDS—*mere impairment of grantor's memory does not invalidate deed.* The mere impairment of the grantor's memory by reason of old age does not, of itself, indicate a want of power to comprehend a transaction and to dispose of his property by deed.

2. SAME—*what is necessary to justify a court in setting aside a deed.* To justify a court of equity in setting aside a deed for mental incapacity it must appear that the grantor did not have sufficient mind and memory to comprehend the nature and character of the transaction in which he was engaged.

3. SAME—*what shows capacity to make a deed.* Testimony by the attorney who drew a deed that the grantor came to his office and explained what he wished to do with his property and asked in what manner he could best accomplish his purpose; that his statements were clear and rational and his questions intelligent and pertinent; that after reaching his conclusion the deed was prepared and read to him, and that he took it away with him and returned with it the next day, saying he was satisfied with it and was ready to execute it, shows that the grantor comprehended the transaction.

4. UNDUE INFLUENCE—*undue influence such as will vitiate deed means wrongful influence.* Undue influence such as will vitiate a deed means wrongful influence operating at the time the deed was made, with such force as to deprive the grantor of his free agency.

5. SAME—*rule as to proving undue influence by circumstances.* If the circumstances relied upon to establish undue influence in the making of a deed are equally consistent with some other rational theory deducible from the facts proven, the charge of undue influence cannot be regarded as established, especially where the direct evidence bearing upon the matter shows mental capacity and absence of undue influence at the time the transaction took place.

6. SAME—*rule as to burden of proof where fiduciary relation is shown.* The rule requiring a grantee standing in a fiduciary relation to the grantor to establish the fairness of the transaction when the deed is attacked applies to attorney and client, guardian and ward, and to parent and child where the parent receives the benefit; but the rule does not apply where the parent makes a will or

other provision for his child or foster child, unless the evidence tends to show there was, in fact, undue influence or fraud.

7. SAME—*when mere fact of relationship raises no presumption.* The mere fact that the grantee in a deed is the grantor's foster daughter does not raise any presumption of law which requires the grantee, in the first instance and without any proof of fraud or undue influence upon her part, to prove that the transaction was fair and free from undue influence.

SCOTT, CARTER and DUNN, JJ., specially concurring.

APPEAL from the Superior Court of Cook county; the Hon. THEODORE BRENTANO, Judge, presiding.

This is a bill in equity filed by appellant in the superior court of Cook county to set aside a deed made by J. Lafayette Curtis, dated August 27, 1902, purporting to convey to appellee Margaret C. Vaughan the premises known as 377 Dearborn street, Chicago. In general the bill alleges three grounds for setting aside the deed: First, mental incapacity of the grantor; second, actual undue influence exerted by the grantee and her agents; third, presumptive undue influence arising out of what is alleged to be the fiduciary relation existing between the grantor and the grantee. The cause was heard below and a decree was entered dismissing the bill for want of equity. Appellant, by his appeal, has brought the record to this court for review.

Numerous witnesses were heard on the trial and the record is voluminous, consisting of over 2500 typewritten pages, of which over 2000 are devoted to the testimony.

J. Lafayette Curtis died November 9, 1903, at about the age of eighty years. His wife, Helen A. Curtis, had died in May, 1902. He had resided in Chicago for thirty years, and had been engaged in loaning money, conducting a private bank and in the real estate business. Prior to coming to Chicago to reside he had lived in Keokuk, Iowa, where he had been engaged in the patent medicine business. He had no children of his own, and about 1860 took appellee Mrs. Vaughan, then about two and one-half years old, from

an orphan asylum and raised her, never, however, legally adopting her as his daughter. She was known in her childhood as Maggie Curtis. She was married in 1875 to a man named Vaughan, who shortly thereafter became insane and was confined in an insane asylum until 1879, when he was discharged as cured. Mrs. Vaughan, soon after her husband's discharge, went with him to Baltimore, Md., where they resided until 1889, when they removed to Mt. Vernon, Ohio, where Vaughan died, about 1892. Mrs. Vaughan, with her four children, continued to reside in Ohio until 1902. Two of her children were unfortunate and are not capable of caring for themselves. From 1891 until the death of Mrs. Curtis, in 1902, Mr. Curtis supported Mrs. Vaughan and her children in Mt. Vernon, Ohio, sending her $100 per month. Mr. Curtis had acquired considerable property in Chicago, and was also the owner of property in Keokuk, Iowa, and farm lands in Iowa and Minnesota. In 1900 he employed H. L. Cowles, a nephew of his wife, at a salary of $125 per month, to attend to his business, such as collecting rents, looking after property, dealing with tenants, etc. Mrs. Curtis at this time requested Cowles to keep Mr. Curtis interested in the business and to consult with him in regard to the management of affairs. Cowles and his wife, Grace Caroline Cowles, took up their residence in the Curtis home and remained there until about six weeks after the death of Mrs. Curtis, in May, 1902. During that time Cowles acted as the agent of Curtis in looking after the property, and their personal relations were cordial. At the time of the death of Mrs. Curtis Mrs. Vaughan came to the Curtis home and remained there. Soon after her arrival Cowles and his wife left the house. While Mrs. Curtis was ill she requested Mr. and Mrs. Cowles to continue to reside with Mr. Curtis, and they agreed to do so. Mr. Curtis was averse to notifying Mrs. Vaughan of the serious illness of her foster-mother, saying that she would get there soon enough. The information about the illness of

Mrs. Curtis was sent her by a member of the Cowles family, and not by Mr. Curtis. However, when she arrived, Curtis, who had also asked Cowles to remain with him, changed his mind and permitted Mrs. Vaughan to remain. She had difficulties with various members of the Cowles family and other relatives of Mrs. Curtis, and complained of the disposition made by them of her mother's jewels and laces. When informed of her suspicions that certain relatives of Mrs. Curtis were carrying away small articles from the house, Mr. Curtis became angry with them to such an extent that they ceased to visit the house. Mrs. Vaughan remained with Curtis, and no opportunity was given the relatives of Mrs. Curtis to converse with him out of her presence. She slept in the same room with him and was solicitous as to his wants. On two occasions when H. L. Cowles attempted to secure a private interview with him Mrs. Vaughan interrupted and called Curtis away. On May 20, 1902, about one week after the death of Mrs. Curtis, Curtis made a codicil to his will, making changes that were beneficial to Mrs. Vaughan. On June 6, 1902, Curtis assigned to Mrs. Vaughan his interest in the estate of Henry H. Curtis, of St. Louis, amounting to $5631.44. She collected this interest. On July 2, 1902, Curtis conveyed, by two deeds, one hundred and sixty acres of land in Iowa and some lots and land in Minnesota to Mrs. Vaughan. On July 2, 1902, H. L. Cowles received for Curtis a check for $12,995, payable to Curtis' order. This was in payment for real estate sold in Chicago. Curtis told Cowles to take charge of this check and deposit it next day. Mrs. Vaughan learned about the check, and after a conversation with her Curtis called for and received the check from Cowles. The next day Curtis and Mrs. Vaughan, accompanied by two attorneys, went to the banking house of N. W. Harris & Co., and there Curtis purchased and gave to Mrs. Vaughan $10,850 worth of bonds. Out of the check $1327 was deposited to Curtis' credit, and the record does not show what

became of the balance of the check, amounting to $818. On August 27, 1902, Curtis executed and delivered to Mrs. Vaughan the deed for the property which is in question in this suit. He was seventy-eight years old at the time. The value placed by the appraiser for inheritance tax upon this property was $43,175. On October 29, 1902, he conveyed to her real estate in Keokuk, and a short time before his death he conveyed to her his residence in Chicago and its contents.

The allegation of the bill is, that at the time J. Lafayette Curtis signed the deed in question he was not of sound mind and memory, but, on the contrary, was in his dotage, and that his mind and memory were so impaired at that time as to render him wholly incapable of making any proper conveyance of his real estate. The bill also charges that Margaret C. Vaughan used actual undue influence in procuring the deed, and also that a fiduciary relationship existed between Curtis and Mrs. Vaughan.

The evidence is conflicting in most, if not all, material matters. A large number of witnesses were produced by each side who had known Curtis for varying numbers of years and who were themselves engaged in various businesses and who had met him under conditions which surround one in the ordinary affairs of life. Of these, twenty-seven state facts tending to show that grantor's mental faculties were unimpaired for a period of three months before, and at least that long after, the making of the deed. Twenty-eight witnesses state facts tending to show that during this time J. Lafayette Curtis did not possess the sound mind and memory which the law requires one making a valid transfer of property to possess. Out of this mass of testimony the following facts may be regarded as established by a clear preponderance of the evidence:

J. Lafayette Curtis was a successful business man, who had accumulated property worth in the aggregate about $150,000, perhaps more. He was close in his dealings, and

it had been said of him that he was as hard as adamant. For many years he cared for his own business without assistance, having an office down-town. About 1898 he began to fail physically and seemed liable to become confused about business affairs. He would also in the same conversation repeatedly ask the same question over and over again. He became subject to forgetfulness, frequently forgetting that he had collected rent, and in one instance he left the house leaving a receipt on the table while his tenant had gone into another room to get the money. He had great difficulty in counting money and would ask others to count it for him. He endeavored to take care of his own correspondence, having his wife do the writing for him, and he would dictate a letter over and over again to the same party, making only trifling changes. On one occasion he dictated the same letter ten times. He lost care about his personal appearance, and his wife dressed him, combed his hair and brushed his teeth. Mrs. Curtis expressed the greatest solicitude about his being on the streets alone, because he was easily lost, and confused in his mind the streets of Chicago with those of Keokuk. She took great care that he should not go upon the streets alone, but if occasion demanded that he should do so she would put his name and address upon a piece of paper in his hat-band. He became confused as to the names of relatives, frequently calling them by the wrong name. He was childish in many things and asked foolish questions. It was difficult for him to keep his mind on any subject, and he frequently walked around talking to himself. He greeted guests repeatedly, apparently not knowing that he had greeted them before. His memory failed about matters of recent date, although he could discuss intelligently matters which had happened many years before. He lost his ability to comprehend simple things; thought that the marriage of a neighbor was a funeral; that John Brown had signed the Declaration of Independence, and asked if he was still living in California; did not

230—37

readily comprehend that his wife was dead and referred to her funeral as a reception. He lost, to some extent, his ability to reason about ordinary affairs of life. His mind entertained vagaries and he did not seem to comprehend business matters readily, such as giving a tenant a lease or getting a check for money. His mind acted slowly when considering a business matter. While H. L. Cowles was managing his affairs Curtis would sign checks and discuss his business with Cowles, who talked to him about business affairs on the suggestion of Mrs. Curtis. Upon the death of Mrs. Curtis, H. L. Cowles was named by her as one of the executors of her will. In a safety deposit vault were found several thousand dollars' worth of bonds in an envelope, marked "Property of Mrs. Curtis." Mr. Curtis claimed these bonds as his own, claiming that he had so marked the envelope that in case of his death before that of his wife she should have them without trouble. Proceedings were instituted in the probate court to ascertain the ownership of the bonds, and October 23, 1902, Curtis was called as a witness in the case. This was about two months after the deed in question was executed. He was subjected to a very searching examination. His evidence is in the record in this case and occupies thirty-five pages of typewritten matter. While some of his answers indicate a failure to comprehend the questions, his testimony, in the main, is consistent and intelligent. He told the story of placing the bonds in the bank in his wife's name so that if he died first she could get them, but if not, they were to be reclaimed by Curtis. He never departed from this statement, and his evidence shows that he had as much mental vigor as is usually possessed by persons of his age.

It is the deed to the premises known as 377 Dearborn street that is sought to be set aside in this proceeding. This deed was written by M. L. Coffeen, a lawyer and a member of the firm of Tenney, Coffeen, Harding & Wilkerson. Since it is of importance to determine the issue here involved

with respect to the execution of this deed, it will be necessary to examine in detail the evidence bearing upon the circumstances attending its execution.

James B. Diver, who was Curtis' agent in Keokuk, testified: "He said that the property here [in Keokuk] that I had charge of was to be Maggie's, and also he intended giving the Dearborn street property to Maggie,—Mrs. Vaughan. I think the number of the Dearborn street property is 377. Mrs. Vaughan was in Mt. Vernon at that time. Mr. Curtis didn't say whether she knew of his intention."

M. L. Coffeen testified: "Mr. Curtis and Mrs. Vaughan came to my office together. I was busy when they came in. I went out into the outer office. Mr. Curtis and Mrs. Vaughan were sitting there. I said I would be disengaged in a few minutes and went into my room, and Mr. Curtis followed me in,—said that he wanted to talk with me further. Mrs. Vaughan did not come with him in that interview. She stayed in the outer office and I closed the door. We sat down there alone together in the office. Mr. Curtis told me that he had made up his mind to give his Dearborn street property to Mrs. Vaughan, and again said that he had thought of making a deed to that property to her and holding the deed, because he might want to sell it, and I asked him if he wanted to give her that property outright; if that was what he wanted; if that was in reference to the change in his will that we talked about before or further provision for her. He said yes, it was, but he did not know how he wanted to do it,—whether he wanted to change his will or whether he could deed the property. I told him that if he made a deed to the property and held the deed that it would be valueless unless it was delivered, and that if he wanted her to have that property he had a right to deed it to her, or if he wanted to change his will and put that in his will he could do it that way. 'Well,' he said, 'Mrs. Vaughan will have her home and I want to make a good provision for her, so that she will have income enough to support

herself and her family; you know that she has two children that will always be dependent upon her or upon some one; they can't do anything for themselves to support themselves; I don't want to fix this property,—the title to this property,—so that the title would get into the names of these children if Mrs. Vaughan should outlive me; I want to have the benefit of that property myself while I live, but I want to make a provision so that when I die Mrs. Vaughan shall have the benefit of the property, and that it shall be so fixed that her children will be provided for.' I said: 'Mr. Curtis, you can change your will to cover those conditions if you desire to do so; if you want, you can make a deed of the property to a trustee, reserving the income from the property for your own use and give the income to Mrs. Vaughan while she is alive, so the income will go to these children after her death, if you want to do it that way; or you can make a deed of the property so that she will have the absolute control of it at your death, if you want to, without any trust for her, and make a trusteeship for her children, reserving a life interest if you so desire; there are a number of ways that this thing could be fixed.' 'Well, what would you advise about it?' he asked. I said: 'I think, Mr. Curtis, that if you want to give that property outright to Mrs. Vaughan after your death and at the same time make a provision with reference to these dependent children so that the title will be protected from being tied up on account of their disability, that it would be as well to make a deed to the property, reserving your own life estate in it and the income, and let Mrs. Vaughan have the title at your death, with a provision that if she should die before you die, then that the title should vest in a trustee for the benefit of the children.' He said, 'Well, that is what I will do,' or 'about what I want to do,'—something to that effect. He then asked me if he could make such a deed and make a provision so if he had a good chance to sell the property he could sell it himself. I said: 'I do not think a deed with that

kind of a string tied to it would give a very good title; what you ought to do, in my opinion, Mr. Curtis, is to either change your will and state in it exactly what you want done with that property, or deed it with specific provisions, so that the title will be absolutely vested where you want it to go; now, if you want to create a trust for Mrs. Vaughan so she will have only the income, all well and good; if you want her to have absolute control of it on your death, why, make the deed that way, with a provision that if she dies before you die that the title shall vest in a trustee for the benefit of her children.' 'Well,' he said, 'I have—I want to make her just as little trouble as I possibly can, and I am willing—perfectly willing—after my death that she should do whatever she wants to do with that property.' I said, 'If you say so, I will draw the papers and make a conveyance of that kind.' Then we had some talk about a trustee, and I suggested to him that the Illinois Trust and Savings Bank was an organization well equipped to handle a matter of that kind, if it got around where the trust would become operative. Mr. Curtis said, 'Well, concerns like that charge pretty high, don't they?' I said: 'I don't think they charge unreasonably at all; my experience with most of these trust companies is that they are reasonable and fair, and I advise organizations of that kind rather than an individual generally because they have all the equipment to handle matters of that kind properly.' Well, he said he would see about that. That is the substance of what occurred at that time. I saw Mr. Curtis again on the 20th of August. I talked with him on the same subject. I had been looking up the matter we had talked about before, of the conveyance of the premises 377 Dearborn street. I believe it was in that talk that he said he wanted papers made, and I believe that the trusteeship in the Illinois Trust and Savings Bank was at that time again talked about, and he said, 'All right; let the papers go that way.' On this occasion I think, but I don't recall positively, that both Mrs. Vaughan and Mr. Curtis

were present.  I went to work to get up the deed in accordance with the instructions Mr. Curtis had given me.  I did some work in drafting a conveyance on the 25th of August and also on the 26th, looking up authorities with reference to conveyances of that kind and preparing a form of a deed and getting the matter in shape for execution by Mr. Curtis.  I think I gave the papers to him on the 26th of August,— it may have been the 25th.  I gave a draft of the deed to him and he took it away with him.  I am not positive whether that was the next time I saw him before the time I last referred to.  I am not sure whether I saw him in the meantime, or not, at his house.  I said to Mr. Curtis at that time that I had prepared a deed which was as near in accordance with his instructions as I understood it could be, but that I would like to have him take the paper, look it over very carefully, and if he had any suggestions to make about it at all,—if it was wrong in any particular,—wanted any changes made in it,—to let me know, and he took it and went away.  I think I saw him on the next day, which I think was the day he came in and executed the deed.  That was on the 27th of August, 1902.  On that day Mr. Curtis, I think Mrs. Vaughan and Frank Vaughan,—somebody else,—came down to our office, and Mr. Curtis came into my room and said that 'the paper is all right,' he thought; stated that, or he said this: 'You know I told you I wanted to have the income myself from this property, and as I understand it I go right on and collect the rents and keep the money; it is mine to do anything I am a mind to do with.'  I said, 'That is right, Mr. Curtis.'  Just about that time— I talked with him two or three minutes when I was called out of the office for some purpose or other and was out some little time,—that is, eight or ten or fifteen or twenty minutes,—I don't know how long.  I know I went out.  After a lapse of this time I went back into my office.  Mr. Curtis was sitting there talking with my partner, Mr. Wilkerson.  Nobody was there but Mr. Curtis and Mr. Wilkerson.  I

think Mrs. Vaughan sat down in the outer office. When I came back he was talking with Mr. Wilkerson, and he said the matter was all right and he would execute the deed and sign the deed. I then called a young man who was keeping our books, Mr. Yost, and Mr. Curtis signed the deed, and I think Mr. Wilkerson and Mr. Yost both of them witnessed it, or else—I don't remember just exactly who witnessed the deed just now without looking at it. I think I was one of them, but the deed was executed right there before Mr. Wilkerson, Mr. Yost and myself. The deed was read over by me to Mr. Curtis at the time very carefully, the day I gave it to him. When the deed was executed Mrs. Vaughan was called into the room. I think I spoke to her when she came in. I took the paper off my desk and handed it back to Mr. Curtis, and I said to him, 'Now you have made the deed you can deliver it if you want to,' whereupon he handed it over to Mrs. Vaughan, saying, 'Maggie, here is your deed,' or something to that effect. Mrs. Vaughan handed it to me. I told her I would have it recorded. Mr. Curtis was an old man. His hearing was somewhat defective, and he would talk about a matter and go over it several times sometimes, perhaps repeat it a couple of times, bring up the same matter, and was a little slow in his mental action, but he was always very clear in understanding the matters we talked about during the different conversations that we had with him. His conversations with me in these various transactions and the things he said were perfectly intelligible and relevant to the matters under discussion. There was no indication that he did not understand the matters concerning which he was consulting me and concerning which he was giving me directions during these various conversations with him, other than what I have just said. He was slower than some men in arriving at conclusions, and in talking to him he would ask you what you said, over and over again, sometimes, and you had to elevate your voice somewhat to make him understand, but he did understand everything

perfectly, as far as I ever saw, so far as his business was concerned that I had to do with. In my opinion he was perfectly capable of transacting ordinary business. In my opinion he clearly understood the nature and effect of all the papers that he ever executed that were prepared by me."

James H. Wilkerson testified: "I first saw J. Lafayette Curtis in July of 1902, at the office of our firm. I saw him there a number of times,—ten or more, probably. His business was largely with Mr. Coffeen. I don't remember that I discussed business matters with him, with the exception of the conversation in August with reference to the execution of the deed in question in this case. At that time Mr. Curtis came into Mr. Coffeen's room. My recollection is that I was then in his private office and Mr. Coffeen had to leave the office on some errand. I was there in the office and talked with Mr. Curtis for fifteen or twenty minutes at least, until Mr. Coffeen returned. Mr. Curtis had with him the draft of this deed, and he asked me if I understood what the effect of the deed was. I told him, after I read it over, that he retained the control of the property during his lifetime and if he died the property went to Mrs. Vaughan; then, that in case she died the property went to the trustee, who would manage it and collect the rent and take care of it until (my recollection is) the youngest child reached the age of thirty years, when it would be distributed. He said that was the way he wanted it. He said he wanted her to have property enough so that she could live and keep those children; spoke about some of them not being able to take care of themselves. We had some general conversation that lasted until Mr. Coffeen returned to the office, and he and Mr. Curtis talked with reference to the same theme,—that is, whether or not he retained control of the property during his life. I think I went into my own room a few minutes about something, came back in there, and Mr. Curtis said he wanted to sign that deed, and he signed it, and we called in a young man who was then our cashier, and Mr. Curtis

said he wanted us to witness the signature, so I wrote my name on the deed to witness the signature and Mr. Yost did the same, and he acknowledged the deed before the notary, and after that had been done he took the deed and handed it to Mrs. Vaughan, who in the meantime had come into the room. From my conversations with Mr. Curtis on these various occasions I think he was of sound mind and that he was capable of transacting business. I think he knew absolutely everthing that was done in connection with that deed. I saw nothing that raised any question at any time as to his entire mental competency."

No other witnesses testify to the occurrences when the deed was executed.

GWYNN GARNETT, CLARENCE T. MORSE, and EUGENE H. GARNETT, for appellant.

SCOTT, BANCROFT, LORD & STEPHENS, (EDGAR A. BANCROFT, and GEORGE T. ROGERS, of counsel,) for appellee Margaret C. Vaughan.

Mr. JUSTICE VICKERS delivered the opinion of the court:

In the foregoing statement we have set out what appear to us as the most salient points in the testimony bearing upon the question at issue. The great volume of testimony given on the trial of this cause cannot be set out within the reasonable limits of a statement or discussed in detail in an opinion without unduly extending it. With unusual industry counsel for the respective parties have presented every fact and circumstance which bears directly or remotely upon the questions involved. The range of the testimony extends over a period of a half century, and brings into view a great multitude of statements, acts and circumstances in the life of J. Lafayette Curtis for the purpose of showing whether he had mental capacity on August 27, 1902, sufficient to make a valid deed.

The theory of appellant, both in the pleadings and the evidence, is, that the mind of Curtis was so enfeebled by age that he was incompetent to make a deed. It is not claimed that he was insane or that he was subject to any delusions of any kind, either at the time the deed was executed or at any other time. Mere impairment of memory, by reason of advanced years, does not, of itself, indicate a want of power to comprehend a 'transaction and to dispose of property. (*Francis* v. *Wilkinson,* 147 Ill. 370; *Taylor* v. *Pegram,* 151 id. 106.) In order to justify a court of equity in setting aside a deed or contract on the ground of mental incapacity, it must appear that the grantor did not have sufficient mind and memory to comprehend the nature and character of the transaction in which he was engaged. (*Argo* v. *Coffin,* 142 Ill. 368; *Graham* v. *Deuterman,* 206 id. 378; *Beamer* v. *Morrison,* 210 id. 443.) When the evidence bearing upon the mental capacity of Curtis is considered, it leaves no doubt upon our minds that at the time the deed in question was executed Curtis fully comprehended and understood the transaction in all of its bearings and consequences. The testimony of the attorney who drew the deed is very clear and convincing upon this point. It shows that he fully advised Curtis in relation to the effect of making a deed as well as adding a codicil to his will. Curtis came to the office and explained what he desired to do with the Dearborn street property and asked Mr. Coffeen in what manner he could best accomplish his purpose. His statements were all clear and rational and the questions asked by him were intelligent and pertinent. After a conclusion had been reached as to the instrument to be executed, the deed was prepared by Mr. Coffeen and read by him to Curtis. Curtis took the deed away with him and returned the next day, saying that he was satisfied with the deed and that he was ready to execute it. The deed was then executed and delivered to the grantee. While Mrs. Vaughan accompanied Curtis on these several visits to the attorney's office, she was not present

and took no part in the interviews between Curtis and Coffeen. There is nothing connected with the execution of this deed, so far as this record shows, sufficient to raise a reasonable doubt as to the grantor's mental capacity.

The charge of undue influence is equally untenable. While Mrs. Vaughan was no blood relation to the grantor, yet she occupied in his affections the relation of a daughter. She had been brought into the Curtis home when only two years of age. There were no children born to Curtis and his wife, and it is but natural that they should have bestowed upon their foster-daughter great affection. The fact that Curtis regarded Mrs. Vaughan and her children as the natural objects of his bounty is shown by the circumstance that he supported her and her children out of his means many years before Mrs. Curtis' death, and by the further fact that in his will, made in 1897, while Mrs. Vaughan was residing in Ohio and when there could be no suspicion of want of capacity or undue influence, a liberal provision was made for Mrs. Vaughan and her children. It is no doubt true that Curtis changed his mind, after the death of his wife, in regard to the amount of property he desired to go to his wife's relatives. The interests of his wife's relatives under the will will be largely reduced if the deed in question is upheld, and it is the fact that the deed reduces the interests of certain legatees and increases the interest of Mrs. Vaughan which is relied on as a circumstance tending to show undue influence. The evidence shows that after the death of his wife disagreements sprang up between Mrs. Vaughan and certain relatives of Mrs. Curtis. It is not material to our purpose to discuss these disagreements or seek to determine who was in the right and who in the wrong, but we only refer to it for the purpose of observing that in these quarrels Mr. Curtis seems to have agreed with Mrs. Vaughan. He believed, evidently, that certain relatives of his wife, with undue haste, were seeking to get possession of certain articles of property which had belonged to

his deceased wife. Their conduct in this respect may have had an influence on the mind of Curtis, leading him to reconsider his original intention of disposing of his property for their benefit. Mrs. Vaughan, no doubt, was not unwilling that she should be regarded by Curtis with greater favor than the relatives of his wife, but there is not a particle of evidence in this record that Mrs. Vaughan at any time sought to influence Curtis to execute this deed to her. The appellant's contention on this point is a mere inference sought to be drawn from the manifest change in Curtis' plans for the distribution of his estate and the fact that Mrs. Vaughan was closely associated with Curtis, thus affording abundant opportunity for her to exercise an influence over him, and that such inference is rendered more probable by the mental condition of Mr. Curtis. The most that can be said of these facts is, that they are consistent with the hypothesis that this deed was the result of actual undue influence of the grantee; but they are also equally consistent with the hypothesis that Curtis, either with or without cause, conceived a dislike for his wife's relatives after her death, and for this or some other reason changed his mind, after his wife's death, in regard to the disposition of his property. Again, it is not unreasonable to believe that after Mrs. Vaughan came to make her home with Curtis, bringing with her her four fatherless children, two of whom, as already shown, were wholly incapable of taking care of themselves, the unfortunate condition of the children appealed to the sympathy of Mr. Curtis, and he, acting from motives of affection and duty, determined to increase the provision for Mrs. Vaughan and her children even if it did diminish the provision for his wife's relatives, who were able to take care of themselves, and whose claims upon his bounty, if any claim can be said to exist, should very properly be regarded as inferior and secondary to the claims of his foster-daughter and her unfortunate children.

While undue influence may be established by circumstantial evidence, yet when, as in the case at bar, all the circumstances relied upon are equally consistent with some other rational theory deducible from the facts proven, it cannot be held that the charge of undue influence is established, especially where the direct evidence bearing upon the transaction sought to be impeached conclusively shows mental capacity and absence of any undue influence operating at the time of the transaction.

This court has often had occasion to define what is and what is not "undue influence." Among the latest cases on this subject is *Dowie* v. *Sutton,* 227 Ill. 183. In that case it was said (p. 197) : "The word 'undue,' when used to qualify 'influence,' has the legal meaning of 'wrongful.' Hence, 'undue influence' means a wrongful influence. But influence secured through affection is not wrongful, and when a will is made in favor of a child at his solicitation and because of partiality influenced by affection for him it will not be undue influence.—*Dickie* v. *Carter,* 42 Ill. 376; *Brownfield* v. *Brownfield,* 43 id. 147; *Meeker* v. *Meeker,* 75 id. 260; *Burt* v. *Quisenberry,* 132 id. 385."

Undue influence which will avoid a will or a deed must go to the extent of depriving the party of his free agency; (*Francis* v. *Wilkinson,* 147 Ill. 370; *Wilcoxon* v. *Wilcoxon,* 165 id. 454;) and such influence must operate at the time of the transaction sought to be impeached. In *In re will of Barry,* 219 Ill. 391, at page 397, this court said: "It is further contended on the part of the contestants that the will in question is the product of undue influence over the testatrix on the part of William Mumford. Evidence was introduced to show that William Mumford made a trip almost every month from his home in Pittsfield to the home of the testatrix in Mt. Sterling for the purpose of transacting her business for her, and that he was her confidential and professional adviser as well as her son-in-law. There is no evidence in the record, however, to show that William

Mumford had anything whatever to do with the preparation or execution of the will in question. He was present in the library when the will was executed, but took no part therein, either by word or act. After the will was executed the testatrix sent it to the bank, sealed up in an envelope with other papers, and there it remained for about a year and until after her death. There is no evidence to show any effort on the part of William Mumford to influence the testatrix to make a will, or to favor his son, Barry, in the disposition of her property. In cases in which the burden of proof is thrown upon one standing in a confidential relationship to show the absence of fraud or undue influence in the making of a will, such person must be shown to have been directly connected in some manner with the making of the will. The record fails to show that William Mumford was connected in any manner with the execution of the will. Any suspicion which might be engendered by Mumford's presence in the library when the will was executed cannot be regarded as proof of any such alleged fact. On the contrary, the declarations of the testatrix are in evidence to the effect that William Mumford did not write the will and that he had nothing to do with it."

Finally, it is contended by appellant that the circumstances of this case show a fiduciary relation between appellee Mrs. Vaughan and Curtis in which it is assumed that she was the dominant party, and that the case is for that reason one in which Mrs. Vaughan is required to prove, by clear and satisfactory evidence, the utmost good faith on her part and the absence of undue influence. This position can not be maintained. The rule contended for is applicable to cases of attorney and client, guardian and ward and parent and child, where the parent receives a gift or other benefit from the child. But the rule is not applied where the parent makes a will or other provision for his child. In our opinion this case ought to be governed by the same rule in this respect as would apply between father and child. Gifts of

this sort are natural, and proceed from that tender solicitude for the welfare of his children that is implanted in the bosom of every parent. To hold that such gifts are presumptively fraudulent would be to reverse the legal basis of all presumptions, and to establish the doctrine that when a parent makes a provision for his child by will or deed it will be presumed to be fraudulent, and cast the burden on the child of proving, by clear and convincing evidence, good faith and the absence of undue influence. Presumptions are inferences which common sense draws from the known course of events or from circumstances usually occurring in such cases. If any presumption exists in this case, naturally and logically it would be in favor of the validity of the deed, since a gift to his foster daughter by Curtis was, under the circumstances, the usual, ordinary and reasonable thing to be expected of him; but we do not hold that there is any presumption in the case one way or the other.

Appellant assumes that if the evidence proves, or tends to prove, that Mrs. Vaughan occupied a position of influence, in fact, over Curtis, the burden of proof shifts from appellant to her, and requires her to prove, by clear and satisfactory proof, the absence of undue influence. In this argument we think that appellant confuses an inference of fact with a presumption of law. There is no presumption of law arising from the relation of these parties which will cast on Mrs. Vaughan the burden, in the first instance, of proving that the execution of this deed was not procured by any undue influence on her part over the grantor. Appellant charges the fact to be that the deed was thus procured. The burden of proof upon that question is on the appellant throughout, and is not shifted to Mrs. Vaughan by proof merely of the relationship between the parties. There is no proof in this record that Mrs. Vaughan exercised or attempted to exercise any influence whatever over Curtis to induce him to execute the deed. If there was such evidence there might be drawn an inference of fact of more

or less strength, depending on the quantity and quality of the evidence upon which it rested, and such inference might be strong enough to justify a decree setting aside the conveyance unless it was removed by other proof. Such inference, however, is quite a different matter from a legal presumption based on the bare fact that Mrs. Vaughan was the foster daughter of the grantor. If such presumption could be applied, then appellant would be entitled to a decree by merely proving the existence of the relation and the conveyance made while such relation existed, unless Mrs. Vaughan established, by clear, satisfactory and convincing evidence, that the transaction was fair and free from all suspicion of undue influence. Such is not the law as applied to the facts of this case.

Finding no error in the record the decree of the superior court of Cook county is affirmed.      *Decree affirmed.*

SCOTT, CARTER and DUNN, JJ., specially concurring:

We agree to the conclusion reached by the foregoing opinion, but we think that opinion erroneously gives the impression that the usual presumption which arises where there is a fiduciary relation and the dominant party secures from the dependent party a gift, bequest or devise of property does not obtain unless the confidential relation is an ordinary, technical, fiduciary relation, such as that of guardian and ward, attorney and client, etc.

In *Thomas* v. *Whitney,* 186 Ill. 225, the following language was quoted with approval: "Certain transactions are presumed, on grounds of public policy, to be the result of undue influence. Such transactions are generally those occurring between persons in some relation of confidence, one toward another. The presence of such relationship creates a presumption of influence, which can generally be rebutted by proof that the parties dealt as strangers, at arm's length;

that no unfairness was used, and that facts in the knowledge of the one in the position of influence, affecting the matter, were communicated to the other." "Nothing can tend more to produce confusion and inaccuracy in the discussion of the subject (undue influence) than the treatment of actual undue influence and fiduciary relation as though they constituted one and the same doctrine." "The term 'fiduciary' or 'confidential relation,' as used in this connection, is a very broad one. It has been said that it exists and that relief is granted in all cases in which influence has been acquired and abused, in which confidence has been reposed and betrayed. The origin of the confidence and the source of the influence are immaterial. The rule embraces both technical fiduciary relations and those informal relations which exist whenever one man trusts in and relies upon another. The only question is, does such a relation in fact exist?" This court in that case then continued as follows: "Transactions between a party and one bearing a fiduciary relation to him are upon his motion *prima facie* voidable upon grounds of public policy, and the burthen of proof, the fiduciary relation being established, is upon the one receiving the benefit to show an absence of undue influence by establishing the fact that the party acted upon competent and independent advice of another or such other facts as will satisfy the court that the dealing was at arm's length, or he must show that the transaction was had in the most perfect good faith on his part and was equitable and just between the parties, or, as some of the authorities say, that it was beneficial to the other party." The law has been so held by this court in many subsequent decisions, among which are the following: *Weston* v. *Teufel,* 213 Ill. 291; *Leonard* v. *Burtle,* 226 id. 422; *Morgan* v. *Owens,* 228 id. 598.