JULIA M. RIORDAN, Plaintiff in Error, *vs.* GEORGE MUR-
RAY *et al.* Defendants in Error.

*Opinion filed April 19, 1911.*

1. DEEDS—*impairment of memory by reason of old age does
not, of itself, show want of capacity.* Impairment of the grantor's
memory by reason of old age does not, of itself, show a want of
power to comprehend the transaction and to dispose of the prop-
erty, and is not ground for setting aside the deed as against a
preponderance of the evidence in favor of her ability to know and
comprehend the nature of her act in making the deed.

2. SAME—*when deed will not be set aside for undue influence.*
Undue influence, such as will avoid a deed, must go to the extent
of depriving the grantor of free agency and must have been operat-
ing when the deed was made, and such influence cannot be said to
exist where the grantee was not present when the deed was made,
and there is no evidence to show that the idea did not originate
entirely with the grantor or that the grantee exercised any influ-
ence over her at any time, other than would naturally flow from
his kindness to the grantor in her times of need.

WRIT OF ERROR to the Circuit Court of Cook county;
the Hon. JESSE A. BALDWIN, Judge, presiding.

MCINERNEY, POWER & BYRNES, for plaintiff in error.

UNDERWOOD & SMYSER, for defendant in error George
Murray.

Mr. CHIEF JUSTICE VICKERS delivered the opinion of
the court:

Julia M. Riordan filed a bill in the circuit court of Cook
county against George Murray, Paul F. Riordan, Madeline
C. Riordan, Helen L. Riordan, Walter E. Riordan and
Donovan H. Riordan for the purpose of setting aside a
deed made by Sarah Ann Riordan on the 11th day of Oc-
tober, 1906, to George Murray, purporting to convey a
residence property belonging to the grantor, described as

lot 17 in C. J. Hull's subdivision of block 9 and part of block 10 in the Canal Trustees' subdivision of the southeast quarter of section 17, township 39, north, range 14, and situated in the city of Chicago. The grounds for setting aside the deed, as stated in the bill, are, that the grantor, Sarah Ann Riordan, at the time said deed was executed, was eighty years of age and not of sound mind and memory, and wholly incapable, by reason of her weakened condition, both in body and mind, from age and disease, of comprehending the nature and consequences of any business transactions, and that the grantee, George Murray, who sustained a fiduciary relation to the grantor, exercised undue influence over her mind, whereby she was induced, through such influence and persuasion, to convey to said Murray the property above described without any valuable consideration. The bill was answered by Murray, who denied all of the essential averments thereof, and the cause was heard upon evidence in open court. The trial court rendered a decree dismissing the bill for want of equity, and the complainant below, Julia M. Riordan, has sued out a writ of error to bring the record into review in this court.

The evidence heard before the court shows the following facts: Sarah Ann Riordan owned the property involved, which is valued at about $2800, and was improved by a dwelling in which she resided for several years prior to her death. The property is located in the vicinity of Hull House. Mrs. Riordan had no children living, but the plaintiff in error and defendants in error (other than George Murray) were her grandchildren. The evidence shows that Mrs. Riordan for several years before her death, which occurred in December, 1906, lived in the house on the premises in question, alone. She was afflicted with an ulcer on one of her limbs and was too old and feeble to attend to any outside affairs. George Murray was a policeman assigned to duty in the neighborhood of Hull House. Some ten years before the execution of the deed in question Mur-

ray's attention was drawn to the helpless condition of Mrs. Riordan, and he began to take an interest in looking after her affairs for her and aiding her in various ways in managing her outside business matters. It does not appear that there was any contract of employment between Murray and Mrs. Riordan, but he seems to have regarded her as in need of some one to help her and he volunteered to do what he could for her. The evidence shows that he bought her groceries and other supplies, she furnishing him the money, and had them delivered to her, and that he frequently called at her place to inquire about her welfare. About two years before her death Mrs. Riordan moved from her home to an apartment in Hull House, and Murray assisted in moving her to that place. In May before her death Mrs. Riordan again changed her residence and went to live at 380 Polk street, and Murray took her from Hull House to this place of residence in a wheel-chair. Mrs. Riordan occupied a flat on Polk street until the 26th of September, 1906, when, at her request, Murray moved her and her furniture back to her own home. The evidence shows that Mrs. Riordan realized that she could not live long, and requested that she be taken back to her own house because she said that she would rather die in her own house than elsewhere. During the time that Mrs. Riordan lived at Polk street a lady by the name of Mary O'Reagan lived with her and did her household work for her. While Mrs. Riordan resided at Hull House and on Polk street her own house was rented, and Murray collected her rents for her and paid the money to her as he received it. The evidence fails to show that any of her grandchildren did anything for Mrs. Riordan, except some of them would occasionally call on her and ascertain how she was getting along. The proof abundantly shows that Murray was her sole reliance for aid and assistance for several years prior to her death. There is evidence tending to show that several years before her death Mrs. Riordan had executed a deed conveying the property

in question to her grandchildren above named, but this deed was never delivered and it is not claimed that any title passed by it. Plaintiff in error and her brothers and sisters claim the property by descent and not under a deed. There is also some proof that Mrs. Riordan in her lifetime often stated that at her death her property would go to her grandchildren. But none of these statements were made after the execution of the deed to Murray.

In the early part of October, 1906, Mrs. Riordan requested Murray to send for F. H. Deknatel, who had for many years been a resident of Hull House and who was intimately known to Mrs. Riordan, for the purpose of drawing her will. Deknatel, not being sufficiently advised as to the preparation of a will, took the advice of an attorney and afterwards prepared a will which was executed by Mrs. Riordan in proper form, by which she devised the property in question to Murray. After the will was executed, Mrs. Riordan, having no other property than that involved in this suit, concluded that it would be more convenient and less expense to execute a deed, and accordingly she requested Murray to have some one prepare a deed and bring it to her to be executed. Murray then went to the law offices of Wolfner, Healy & Young, which were located in the Rector building, in Chicago, and saw Charles R. Young, of that firm, and requested him to prepare a deed and take it down to Mrs. Riordan for execution. The deed was prepared on the afternoon of October 11, 1906, and on the same day Murray and Young went to the hospital where Mrs. Riordan was and the deed was executed by her. The evidence of Young, which is wholly uncontradicted, is that he and Murray went to the hospital where Mrs. Riordan was being cared for, and upon arriving there they took the elevator and went to the floor on which was located Mrs. Riordan's room. Murray remained in the hallway, one hundred or one hundred and fifty feet away from Mrs. Riordan's room. Young inquired of some of

the attendants and was directed to Mrs. Riordan's room. He went in and introduced himself and told Mrs. Riordan that Murray had sent him there with a deed to be executed by her. Mrs. Riordan said that she had told Murray to have some one prepare the deed and bring it to her. Young details quite an extended conversation with Mrs. Riordan, lasting fifteen or twenty minutes, in which she told him that Murray had been very kind to her and had treated her more like a son than a stranger; that she had concluded to re-pay his kindness to her by giving him this property. Young testifies that he read the deed to her and explained fully its legal effect; that he said to her, in substance, "You understand, now, that when you sign this, deed Mr. Murray will become the owner of your house and lot?" 'to which she replied that she understood it and that was what she desired to do. When she came to sign the deed she told Young that she could not write her name, and he said that she could sign it by making her mark but that he thought it would be better to have a witness to her signature if she signed by mark. Young then went into the hall and called Miss Grace Collins, a nurse, who happened to be the first person he saw, and Miss Collins came into the room and witnessed Mrs. Riordan's mark on the deed. After the deed was executed Mrs. Riordan told Young to have it recorded and delivered to Murray. During this entire transaction Murray was not present and Mrs. Riordan did not know that he was in the building. After the deed was executed she inquired for Murray and said she would like to see him, and thereupon Murray was brought into the room and some conversation was had between him and Mrs. Riordan, but Murray did not testify in the case and the other witnesses were either not present or did not hear this conversation. Young testifies that at the time the deed was executed Mrs. Riordan had sound mind and good memory for a woman of her age.

Louis E. Jelinek, a witness introduced by plaintiff in error, testified that he had been well acquainted with Mrs. Riordan for the last twenty years of her life; that he saw her very frequently during that time and was a visitor at her house. He testifies as to the physical condition of Mrs. Riordan, and agrees with all of the other witnesses that she was very feeble the last few years of her life, but says that she had a good mind and memory for a woman of her age up to the time of her death; that he often talked with her about old times and she could not always recall things clearly. He testifies that she always spoke in very high terms of Murray.

Mary O'Reagan, who was constantly with Mrs. Riordan for about four months, from May to September, 1906, also testifies to the feeble physical condition of Mrs. Riordan. This witness testifies that Mrs. Riordan would often lay things down and forget where they were, and that she did not always recognize her friends when they came in, and that she would remember things that happened years before better than she did current events. This witness says that she was weak and forgetful.

Dr. Joseph F. Dolamore testified that he treated Mrs. Riordan about eight months before she died; that he visited her a number of times and gave her treatment. He visited her when she lived at her own house and finally saw her at Murray's house, where she died. He describes her physical condition, and says that she had an ulcer on her right leg and had large varicose veins; that she died from endocarditis, or inflammation of the lining membrane of the heart. When Mrs. Riordan died Dr. Dolamore made a certificate of death in which he stated that she died from endocarditis and senility. This witness testifies that Mrs. Riordan gave no evidence of anything mentally wrong, as far as he could see; that he conversed with her on each occasion when he would visit her, except the last one, which was about two days before she died. At that time she was

unconscious. He gives it as his opinion as a physician that with the exception of the time when he saw her last she was of sound mind and able to transact business. Some other witnesses testify to a failure of Mrs. Riordan, at times, to recognize her friends readily, and to forgetfulness of transactions that had recently occurred.

In a general and substantial way the foregoing is a statement of the most important facts connected with Mrs. Riordan's condition and the circumstances under which she executed the deed sought to be set aside. From the foregoing statement it is apparent that the charges in the bill, of unsoundness of mind and undue influence exercised over Mrs. Riordan by the grantee in this deed, are not sustained by the evidence. There is not sufficient evidence of mental incapacity to raise a reasonable doubt as to the ability of Mrs. Riordan to comprehend the nature of the act of making a deed. It is true that the evidence shows that her memory was to some extent impaired by age, but this court has often held that mere impairment of memory by reason of advanced years does not, of itself, indicate a want of power to comprehend a transaction and to dispose of the property. *Francis* v. *Wilkinson,* 147 Ill. 370; *Taylor* v. *Pegram,* 151 id. 106; *Sears* v. *Vaughan,* 230 id. 572.

The charge of undue influence is not sustained. Even if it be conceded that a fiduciary relation existed between the parties to this transaction which would cast upon Murray the burden of proving, by clear and satisfactory evidence, that the deed was executed freely, voluntarily and without any undue influence on his part, we think the evidence satisfactorily meets the requirements of the rule. Undue influence which will avoid a will or a deed must go to the extent of depriving the party of free agency, (*Wilcoxon* v. *Wilcoxon,* 165 Ill. 454,) and such influence must operate at the time of the transaction sought to be impeached. (*In re Will of Barry,* 219 Ill. 391; *Sears* v. *Vaughan, supra.*) There is no evidence whatever in this

record that Murray ever requested Mrs. Riordan to execute the deed in question, and the uncontradicted evidence is that at the time the deed was executed the grantee was not present. The entire transaction seems to have originated with Mrs. Riordan. Her grandchildren, who are seeking to set aside this deed, were her nearest blood relatives. During her declining years, when she was most in need of their aid and assistance, they paid very little attention to her. It is not unnatural or unreasonable that in view of the course her grandchildren had pursued toward her, and in view of the unusual and extreme kindness of Murray to her, she would, from a feeling of gratitude to him, desire to give him this property instead of leaving it to be divided among her grandchildren. At all events this is what she did, and there is nothing in this record that casts a suspicion upon the validity of the conveyance.

The court below properly dismissed the bill for want of equity, and its decree will be affirmed.

*Decree affirmed.*