(No. 17596.—Decree affirmed.)
HENRY HOELSCHER *et al.* Appellants, *vs.* CORNELIUS
HOELSCHER *et al.* Appellees.

*Opinion filed October 28, 1926.*

1. DEEDS—*what constitutes mental capacity to make deed.* The
test of mental capacity to make a deed is that the grantor must
have sufficient mind and memory to comprehend the nature and
effect of his act and to exercise his own will, and impairment of
memory by reason of advanced years does not, of itself, indicate
lack of mental power to comprehend a transaction and dispose
of property.

2. SAME—*master's report in suit to set aside deed is advisory,
only—review.* In a proceeding to set aside a deed upon the ground
of mental incapacity and undue influence the report of the master
in chancery is of an advisory nature, only, and all facts are open
for consideration in the first instance by the trial court and by the
reviewing court in case of an appeal, the question on the appeal
being whether the decree was proper under the law and the evi-
dence, without regard to the finding of the master upon any par-
ticular question of fact.

3. SAME—*what undue influence is sufficient to set aside deed.*
Undue influence which will avoid a deed must go to the extent of
depriving the grantor of his free agency, and such influence must
operate at the time of the transaction sought to be impeached.

4. SAME—*influence procured through affection is not wrongful.*
The term "undue influence" means a wrongful influence, and in-
fluence procured through affection is not wrongful.

5. SAME—*relationship of parent and child does not raise pre-
sumption of undue influence.* The mere relationship of parent and
child does not, where the parent is the grantor and the child the
grantee, raise any presumption of undue influence, and in such case
there must be proof of fraud or undue influence in fact in order
to avoid the deed.

APPEAL from the Circuit Court of Monroe county; the
Hon. GEORGE A. CROW, Judge, presiding.

D. E. KEEFE, R. E. GAUEN, and CHARLES MORRISON,
(HAROLD G. BAKER, of counsel,) for appellants.

J. W. RICKERT, and A. C. BOLLINGER, for appellees.

Mr. JUSTICE HEARD delivered the opinion of the court:

Charles Hoelscher, aged eighty-three years, a resident of Monroe county, died testate on March 31, 1924, leaving him surviving his sons, Cornelius, Herman and Henry, and his two daughters, Bertha Loeffler and Elizabeth Moresburg. His wife died in 1910. He had been a farmer and lived on the farm in question for about forty-two years, up to his death thereon. January 7, 1924, he conveyed the farm in question to his son Cornelius, one of the appellees, and at the same time executed a will, in which he bequeathed his personal property, amounting to about $6000 or $7000, to his children and a grandson, the son of Cornelius. Shortly after the death of Hoelscher appellants filed their bill in chancery in the circuit court of Monroe county, charging that Hoelscher was feeble in mind and body at the time of the execution of the deed; that he was unduly influenced by Cornelius to execute such deed; that Cornelius had designed a plan to become the owner of the property, and that the father, on account of advanced age and his feeble condition, was easily influenced, and that there was a confidential relation existing between Cornelius and his father at and before the time of the execution of the deed in question. The appellees are Cornelius Hoelscher and James R. Hewitt, the latter holding a mortgage on the property. Cornelius (who will hereafter be referred to as appellee) filed an answer denying all such allegations, and after replication filed the cause was referred to a special master in chancery. The special master, after hearing the testimony, made findings that the material allegations of appellants' bill were proven and recommended a decree in their favor. To this finding by the master appellee filed objections. The objections were overruled by the master and stood as exceptions to the master's report. The court sustained the exceptions to the master's report and decreed that the bill be dismissed for want of equity, from which decree the complainants have appealed to this court.

The questions involved in this case are the questions of fact as to whether or not at the time of the making of the deed in question Charles Hoelscher had sufficient mental capacity to make a deed, and whether or not such deed was his free and voluntary act or the product of undue influence.

The evidence shows that after the death of Charles Hoelscher's wife, he, Bertha Loeffler, Elizabeth Moresburg and a son, William, who died in 1923, resided upon the farm, the father running the farm until July, 1912, at which time he gave these three children a lease on the premises for a period of one year with an option of renewal for another year, which option they did not exercise. The father reserved the right to occupy one room in the dwelling house and to receive his board free of cost. During this time appellee lived on a farm about eight miles distant and Hoelscher spent considerable of his time there. After the expiration of the lease appellee and his family moved upon the premises and the father made his home with them until the time of his death. There is no question in the case but that during all that time he received kind and careful treatment from appellee and his family. Two of the witnesses stated that upon the death of the wife of appellee, in 1921, Hoelscher said, "I have lost my best friend." The evidence shows that Hoelscher was not educated in the English language and that he could neither read nor write it. There is evidence that at times he signed documents with an X. The son Henry testified to a conversation with appellee in 1912 wherein appellee said he wanted the farm and that he and Henry could get it between them. This conversation is denied by appellee. Another witness testified that in 1912 appellee, while living on a rented farm, said that he was the oldest married son and that he thought he ought to have the home farm, and that at the expiration of the lease which his father had made to the other children he would have a chance to get the farm. Other witnesses testified to an attempted division of some property,

which was prevented by appellee. There is testimony to the effect that appellee openly destroyed and burned a will of the father, but there is no evidence that this was not done at the direction of the father, and the evidence shows that the father made three wills after that one, one of which was in existence at the time the will was burned. Elizabeth Morèsburg, a daughter, testified that upon one occasion after an attorney and a priest had been to the home for the purpose of making a will for Hoelscher, at which time appellee was not present, appellee on his return home the next morning struck her because she said to him, "Well, Cornelius, why can't you agree to what they want to do?" Appellee denies this. Bertha Loeffler, the other daughter, testified that on one occasion, about 1920, she went to appellee's home and went up-stairs, with his wife's consent, to get some quilts, and that appellee came up-stairs and caught hold of her and threatened to throw her down. Appellee testified that he never forbade any of his brothers or sisters to come to his place, but that on one occasion when his sister Bertha was on the second floor of his home he took her by the arm and told her that he would throw her down the stairs and that she should keep away from there. There is no competent evidence in the record that appellee at any time attempted to prevent any of appellants from visiting their father or their father from visiting them. The evidence shows that Henry, after the death of his mother, only visited his father once a year. The daughters lived within a few miles of their father, one in Belleville and the other in St. Louis, Missouri, but they did not visit their father oftener than twice a year. Henry and his sisters testified that upon the last occasions when they visited their father he did not at first recognize them, and that he was forgetful. After the death of appellee's wife her sister and her husband kept house for appellee for about three months. They testified that Hoelscher was forgetful, and that at times in putting on his shirt he would put

it on wrong, and he would have to be told to turn it around and button it in front. Another witness, who lived in St. Louis, testified that she saw Hoelscher in October, 1923, and that on another occasion, about three or four years before that time, she had a conversation with him lasting about half an hour, and that on neither occasion was she able to make him understand who she was; that while she had not seen him for seven or eight years prior to the first of these occasions, before that time she had visited in his family and seen him many times and her father and Hoelscher were great friends. A witness testified that about three years before the hearing, when he was seventeen years old, he came with his father to the farm one day and that he could not make Hoelscher understand who he was or where he lived. The father of this witness, who had known Hoelscher at least thirty-five years, testified that in June, 1922 or 1923, in company with his son, he went to the farm and that Hoelscher asked the boy who they were; that at the time of the funeral of appellee's wife witness talked to Hoelscher and that he then knew him. A witness, a cousin of appellee and appellants, who had a deep-seated feeling against appellee, whom she said she could not ever forgive, testified that in the last years of Hoelscher's life she thought he was feeble-minded, and that he didn't know half the time what he was saying or doing, the way he acted; that at times he would talk and at times forget. A bank cashier, in whose bank Hoelscher made deposits from time to time, testified that Hoelscher did business with his bank from 1912 up to about two years before his death, during which time he talked with him frequently; that he came into the bank when it was necessary and made the deposits himself; that he had no pass-book but would deposit all his money upon certificates of deposit; that he usually put his certificates of deposit in his safe deposit box; that from time to time witness went over his certificates with him, for he said he could not remember how

much he had; that he repeated that to witness more than once,—not so much in the beginning as in later years; that he did not carry an account of that kind up to the time of his death, for it was closed prior to his death; that he did not close the account all at once, but as the certificates became due they came in through another bank; that in talking with him about these certificates of deposit he spoke intelligently but was very forgetful; that he would ask the same questions four or five times and then come back and again ask the same questions; that he had occasion to explain to him the statements which the bank made for him; that he did not seem to be able to remember them; that toward the end his memory was very weak; that witness noticed that he was getting weaker in his mind as the years went by, and also in his memory; that he did not have any occasion to discuss business matters, such as farming, threshing and the like, and they never spoke about anything except bank business; that two or three years before his death,—the last year that he was a depositor with the bank,—he said he couldn't do anything any more; that witness should do the work for him; that after he became a regular depositor witness looked after his affairs simply because he could not read the English language; that in the last two or three years while he was a depositor in the bank witness did not show any more attention to him than he had before; that he usually came to the bank alone; that the only time that witness could remember that anyone was with him was the last time that he came, when the cashier of the State Bank of Waterloo was with him. Another witness testified that on one occasion he met him in Waterloo during the winter of 1923; that he was confused as to the location of a bank to which he wished to go. A physician testified that he had occasion to treat Hoelscher in 1916 for a fracture of the hip and in the treatment it was necessary to use splints and extensions, and that Hoelscher would take off the dressings and extensions, saying

that he could not stand it and simply would not stand it, and hung his legs out of the bed; that he took the dressings and extensions off three or four times; that witness went out to see him four times; that he knew him up to the time of his death, and after the fracture he had a bad hip; that he got around with a cane; that he did not have as good results as he should have had; that in the last few years he did not see much of him but after the fracture his health was never as good; that he was not able to get about as he had before; that up to the time he received the fracture his health was fairly good; "that anything that would lower his vitality like the fracture did, certainly would lower his mental condition or practical general condition;" that from his studies of physiology and anatomy and from dealings with persons afflicted with disease, if a person's mental condition were affected he certainly would be more easily influenced; that the chances are that the will power of a person would be decreased by reason of physical impairment at that age and under those physical conditions; that there are some attorneys who are very glad to get prescriptions from him; that he did not find Hoelscher an unusually stubborn nor a very strong-willed man; that he was just about normal as to that.

It is to be noted that while the evidence shows that during the last years of his life Hoelscher was a frequent visitor at Waterloo, going alone by interurban railway or over the hard road, where he came in contact with men in various walks of life, and shows that many persons came to his home on business or otherwise, not a single witness testified that in his opinion Hoelscher was not of sound mind and memory, and only one, the woman who confessed to a deep-seated feeling against appellee, testified that Hoelscher was feeble-minded or too deficient in mentality to transact the ordinary business of life. There was no evidence of slovenliness of dress or filthy or disgusting conditions, which we so often find in cases of this character.

On the other hand, twenty-six witnesses, among them bankers, millers, insurance agents, farmers, laborers, a barber, butcher, store-keeper, railroad employee, farmhand, housekeeper, furniture dealer, hard road patrolman, automobile salesman, livestock dealer, thresher, lawyer and physician, on behalf of appellee gave their opinion as to Hoelscher's normal mentality and ability to transact ordinary business. The great weight of the evidence is to the effect that Hoelscher, while old, lame and feeble physically, was intelligent and fully understood the ordinary transactions of life. The physician who treated him in his last illness and who had known him for at least forty years, testified that while not a brilliant man he was of sound mind, and that his mind was all right at the beginning of his last illness, which lasted about a week. He attended to his own banking and insurance business, collected his rents, personally settled with the millers as to his share of grain coming to him from his tenants, kept his accounts separate from appellee's and personally transacted all his own business matters. The test of mental capacity to make a deed is that the grantor must have sufficient mind and memory to comprehend the nature and effect of his act. Impairment of memory by reason of advanced years does not, of itself, indicate lack of mental power to comprehend a transaction and dispose of property. The mind may be impaired incident to old age and disease, but if the grantor is able to understand the nature and effect of the business he is engaged in and is exercising his own will his acts are not invalid. *Sharkey* v. *Sisson*, 310 Ill. 98.

It is contended by appellants that the findings of fact by the master will be regarded as *prima facie* correct and will not be set aside or modified unless they are clearly in conflict with the weight of the evidence. The master's report is of an advisory nature, only. All the facts are open for the consideration, in the first instance, of the trial court, and in case of an appeal by the reviewing court. In

*Chechik* v. *Koletsky,* 311 Ill. 433, the rule is laid down that the ultimate and final question in this court is, Was the decree rendered by the chancellor the proper one under the law and the evidence, without regard to the finding of the master upon any particular question of fact?

It is contended by appellants that by reason of the relationship between the parties it was incumbent upon appellee, in order to sustain the deed, to show that the transaction was fair and free from undue influence. Undue influence which will avoid a deed must go to the extent of depriving the party of his free agency, (*Wilcoxon* v. *Wilcoxon,* 165 Ill. 454,) and such influence must operate at the time of the transaction sought to be impeached. (*In re will of Barry,* 219 Ill. 391.) The term "undue influence" means a wrongful influence. Influence procured through affection is not wrongful, and it has been held that when a will is made in favor of a child at his solicitation and because of partiality, influenced by affection for him, it is not procured by undue influence. (*Dowie* v. *Sutton,* 227 Ill. 183.) The mere fact of the relationship of parent and child does not, where the parent is the grantor and the child the grantee, raise any presumption of undue influence, (*Smith* v. *Kopitzki,* 254 Ill. 498,) and in such case there must be proof of fraud or undue influence in fact in order to avoid the deed on those grounds. (*Sears* v. *Vaughan,* 230 Ill. 572.) In this case no evidence is shown of any actual attempt to influence the making of the deed,— of any act or word on the part of appellee suggesting its execution. A witness who had been a house-keeper at the Hoelscher home from June 25, 1923, until the latter part of October, testified that Hoelscher told her that appellee, his wife and son had been very good to him, and that when he died the farm would belong to appellee because his wife was buried there. The present State's attorney of the county, a former member of the legislature, testified that in December, 1923, Hoelscher talked with him and

the lawyer who drew the deed in question, in the lawyer's office, about the disposition of Hoelscher's real estate, and that Hoelscher said he wanted appellee to have the property in question. The notary public who took the acknowledgment of the deed testified that about two weeks prior to January 7, 1924, (the date of the deed,) Hoelscher came alone to the office of the lawyer who drew the deed, in which office witness was an assistant, and consulted with the lawyer about the making of the deed, and that they then agreed on the date when he should return for its excution; that the lawyer dictated the deed to the witness, who prepared it; that on January 7, 1924, Hoelscher returned, at which time he was accompanied by appellee; that the lawyer read the deed to Hoelscher in the English language and explained each one of the various clauses therein to him in German; that Hoelscher then signed the deed and the witness took his acknowledgment; that before he took the acknowledgment he asked Hoelscher in German if he knew what it was, if he had heard it explained by the lawyer and understood it, and whether it was what he wished it to be; that Hoelscher replied "yes" to each one of the questions; that witness then took the acknowledgment of the deed. There is no evidence that appellee said or did anything with reference to the making of the deed. The evidence shows that Hoelscher at the time of the making of the deed had sufficient mentality to make a valid deed; that he fully understood the transaction and its legal effect; that he made the deed voluntarily and without any undue influence upon the part of appellee.

The circuit court properly dismissed appellants' bill for want of equity, and its decree will be affirmed.

*Decree affirmed.*