FANNIE McGREGOR, Conservatrix, Appellee, *vs.* LAWRENCE KEUN, Appellant.

*Opinion filed April 21, 1928.*

1. EVIDENCE—*what conversation is not admissible in a suit by conservatrix to set aside deeds.* In a suit by the conservatrix of the grantor to set aside deeds executed before the adjudication of mental incompetence, evidence of a conversation with the grantor in which she complained of ill-treatment by the grantee, her son, is not admissible against the grantee.

2. DEEDS—*when decree setting aside deeds must be reversed on evidence.* In a suit in chancery to set aside deeds on the ground of the mental incompetence of the grantor neither the circuit court nor the Supreme Court is concluded by the finding of the jury, and if, upon a full consideration of the evidence, the Supreme Court is of the opinion the finding of incompetence and the decree setting aside the deeds are not in accordance with the facts the decree will be reversed.

3. SAME—*when burden is on a conservatrix to prove grantor's incompetence to execute deeds.* In a suit by a conservatrix of a grantor to set aside deeds executed a year and a half before the adjudication of mental incompetence, the burden is on the complainant to prove her allegation that at the time of executing the deeds the grantor was not of sound mind and memory, as the finding in the proceeding for appointment of the conservatrix applies only to the grantor's mental condition at that time and not at the time the deeds were made.

4. SAME—*when a finding based upon expert testimony cannot be sustained.* In a suit to set aside deeds on the ground that the grantor was not of sound mind and memory, a decree setting aside the deeds upon the testimony of a psychiatrist will not be sustained where the testimony of the expert witness is not in harmony with that of practical and trustworthy lay witnesses, who were well acquainted with the grantor and who have testified to her sound mental condition from actual observations at and immediately before and after the deeds were executed.

5. SAME—*when mental weakness is not ground for setting aside deeds.* Partial impairment of mental faculties is not ground for setting aside deeds by a mother to her son if she had sufficient mind and memory to comprehend the nature and effect of the transactions and to protect her own interest.

APPEAL from the Circuit Court of Cook county; the Hon. HUGO M. FRIEND, Judge, presiding.

T. FRED LARAMIE, for appellant.

MURPHY O. TATE, for appellee.

Mr. COMMISSIONER CROW reported this opinion:

This cause comes by appeal from a decree of the circuit court of Cook county setting aside two deeds executed by Christiana Keun to her son, Lawrence Keun, appellant, on the ground of her mental incompetence to execute them. The first deed, conveying part of the property, consisting of lots in Chicago, was executed January 25, 1922. The second was executed February 18, 1922, conveying the remainder of the lots. Both conveyances were warranty deeds. The latter deed was made subject to a mortgage executed by the grantor securing the payment of a promissory note for $1000. The first deed recited a consideration of ten dollars; the second, one dollar "and other good and valuable considerations."

The grounds for setting aside the conveyances were, that at the time of their execution, and for some time previous

thereto, Christiana Keun was of extremely old age and suffering from an advanced stage of senile dementia, "completely disoriented" and suffering from complete loss of memory both as to recent and past events, wholly without memory and absolutely incompetent to discuss any affairs involving business judgment or reason; that her state of mind was so unbalanced that she did not know that the so-called warranty deeds which she was signing were, in fact, warranty deeds which transferred the ownership of her property to her son Lawrence, but was led to believe that they were papers which had something to do with the settlement of her deceased husband's estate and which would secure her rights in her property. Other charges in the bill are, that Lawrence knew of her incompetency, loss of memory and senile dementia from which she was suffering, and by the use of undue arts, fraudulent practices, falsehoods and misrepresentations induced her to execute the deeds in fraud of herself and her other heirs-at-law, in order that he, alone, might obtain title to and immediate possession of all her property "for his own gain and financial aggrandizement;" that she was at the time of the execution of the deeds under his domination and control and under improper restraint and undue influence by reason of said fraudulent practices. The bill avers that on November 17, 1923, on a hearing before a jury in the probate court, Mrs. Keun was found to be incompetent, wholly incapable of managing her estate or transacting business affairs of any nature or of caring for her personal property, and that she was suffering from an advanced stage of senile dementia, with complete loss of memory as to recent and past events, and that on that day the complainant was appointed conservatrix of her estate.

The answer of defendant admitted the execution of the deeds. It averred they were not without consideration, but that for many years defendant had lived with and supported his father and mother and paid all costs and expenses in-

cident to the maintenance of the property, including taxes, special assessments, repairs and general up-keep of the property, and that his mother was living with him and had made her home with him since the death of his father. He stated that it was the wish of his father that the deeds should be made conveying the property to him, and that he was supporting, maintaining, clothing and caring for his mother in a manner becoming their station in life. He denied specifically all other charges in the bill. He averred that on November 17, 1923, the complainant surreptitiously filed a petition in the probate court by which she was appointed conservatrix of his mother, and that neither he nor his brother had notice of the petition; that on January 5, 1922, one of the daughters, a sister of the complainant, filed a petition asking that Mrs. Keun be declared incompetent, and that upon a hearing on the petition in the probate court on March 9, 1922, a summons having been served upon Mrs. Keun, a jury found that "Christiana Keun is not a distracted person and that she is capable of managing and controlling her estate." To the first petition was appended the following: "I hereby consent to act as conservatrix as prayed herein.—Fannie McGregor."

The only contention is, that on January 25, 1922, and February 18, 1922, Mrs. Keun was incompetent, on account of senile dementia, to execute the deeds conveying the property to her son Lawrence. No evidence was introduced or offered tending to prove the specific charges of misconduct, deceit or fraud on the part of Lawrence. The decree rests solely upon the charge in the bill of Mrs. Keun's mental incompetence. Much testimony was given at the hearing before a jury on the subject of her mental condition. The insistence is, that for a period of time antedating the death of her husband she was incompetent, mentally. Witnesses interested in the result of the suit testified that while her husband lay dead in the home she did not seem to care— that she did not seem sorrowful. At least one witness said

"she seemed dazed." While her husband was in the hospital on account of the injury from which he died she said he would get well. She did not seem to worry, and after he died she did not seem to "show any disturbance or sorrow." At the funeral she acted like a woman burying a friend. She did not cry. The witness did not see a tear. Her brother saw her twice after the funeral. She never mentioned her husband and seemed to be pleasant and did not seem to bother any. At her daughter's home, on Chicago avenue, she appeared to be happy. She said she was glad to be with the girls; that she had been a prisoner where she was; that she was perfectly happy with her daughters; that the woman staying at the place where she was went out every afternoon and left her alone with a small dog, and that was all the company she had. She stayed there and seemed to be happy for probably two or three weeks and "then she commenced to long for her home where she had lived so long; she wanted to go home." Her brother thought that for two or three years before her husband died she was not competent to transact any kind of business; that the condition had grown worse since her husband's death. This witness detailed purported conversations with her about her son Lawrence's ill-treatment of her, which were objected to and the objections overruled, and a motion to strike the answers was denied. That testimony was clearly incompetent. Another witness, a nephew of Mrs. Keun, testified that at her husband's funeral she giggled and laughed like an old lady at a festive gathering. She did not cry while witness was there. Later he drove up in front of the porch where she was sitting and spoke to her. She did not invite him into the house. He noticed a change in her mind—"a lapse of memory"—about six years before the trial of this case. He expressed the opinion she was not competent to manage her business affairs for at least five years. He recited this episode: At the Odd Fellows' Hall in Maywood the sixtieth wedding anni-

versary of Mr. and Mrs. Keun was being celebrated. Witness and his wife went up to them. "She knew my wife and called her by name; when I went up to her she did not answer my salutation; my wife said, 'You know Art?' She said, 'No; I don't think I ever met the gentleman before.'" She was a splendid housekeeper but sometimes would forget things. Sometimes she would remember and other times she would not. She was not like she used to be. One witness, a brother, testified that she did not know the names of her children in 1920 and 1921; that she invited him to have some Holland cheese, and when she set the table she could not find it; that before her husband died she did not seem to worry or feel sorry or act as if anything were wrong; that after he died she did not show any disturbance or sorrow. The opinion of this witness was that for two or three years before her husband died she was not competent to transact business of any kind. Another witness, a sister, testified to substantially the same facts, and that while Mrs. Keun's husband was in the hospital "she had a hallucination that there was a woman in pa's room." She insisted that the property was in her name after it had in fact been conveyed by deed to Lawrence. Other brothers and sisters, nephews and nieces, testified to substantially the same facts. A psychiatrist testified that in October, 1923, he examined Mrs. Keun and that "her judgment and memory were absolutely gone." Other witnesses apparently friendly to the complainant and unfriendly to the defendant testified to acts in 1920 and 1921 that led them to believe she was "confused in all places where she had been in previous years and as to persons she had known in former years." At the trial of this case the complainant put her on the stand as a witness.

In the latter part of December, 1921, Mrs. Keun executed a mortgage to the Proviso State Bank to provide money for taking care of her husband while in the hospital. He had been seriously injured and died of the injury in

January, 1922. A. W. Holden, vice-president of the bank, made the arrangements with her for the loan. He testified that she often came to the bank. When she came she was alone. The loan was discussed by him with her "and the other members of the family." He talked with Lawrence and Mrs. Jacob Keun. Holden testified that he then had no reason to believe her incompetent. None of those now complaining suggested incompetency on the part of Mrs. Keun. Holden was a banker, of kin to none of the parties, and would take no chances as to her mental fitness if he had any occasion to suspect that she was not responsible. He was "sure she knew what she did and talked about." He wrote one of the deeds to the lots now in controversy. His testimony with respect to it is: "I talked with Mrs. Christiana Keun about that mortgage and the lots it covered. Some time later Lawrence came in with his mother and stated that Christiana Keun wanted to give him a deed to a couple of lots, and I got out the papers to get the legal description of these lots. I then discovered the mortgage was on the wrong lots. Mrs. Keun seemed to realize what had happened and started to laugh, and turned to Lawrence and said, 'What are you going to do now, boy?' I then made out a deed conveying the property to Lawrence from the mother. Defendant's Exhibit 3 for identification is my handwriting. I then had a talk with Christiana Keun with reference to what she wanted to do about conveying the lots to Lawrence. Lawrence went out, and while he was out I asked her if she understood that the lots would not be hers thereafter. She said she did and that she wanted him to have them, so I said no more about it. She said she fully understood what she was doing. That is why I asked her. I asked her no further when she said she understood. Lawrence was not there when I asked her these questions. From the conversation I had with her at that time and before and afterwards my opinion is she was competent to understand and knew what she was doing. I

always regarded her as a bright old lady. I was in the
probate court at the time Christiana Keun testified. I met
her in the hall afterwards. From what I saw of her, her
conduct and demeanor while she was in court, my opinion
is she was a competent person to conduct ordinary affairs
or ordinary transactions."

Ross, the attorney who drew the deed, testified he was
present when the mortgage transaction was had. Those
present at the conference when the mortgage was drawn
were Lawrence Keun, Mrs. McGregor, Mrs. Wonnacott,
Jacob Keun, Rudolph Keun and Mrs. Jacob Keun, and it
was held at the home of Mrs. Christiana Keun. The prin-
cipal thing discussed at that conference was the manner of
raising funds to pay the hospital bills of the father, who
was in the hospital at that time. Mrs. Keun was present
at the conference and took part in it, and Ross talked with
her about it. She was opposed to putting a mortgage on
the property, but they had to mortgage the property to raise
the money. After the death of her husband Ross had a
talk with her about drawing up a warranty deed and the
execution of it to Lawrence. He talked with her before the
deed was drawn or executed. She told him just how she
wanted the deed drawn and why she wanted it drawn. She
said she wanted to convey these lots to Lawrence. He had
been a good boy and stayed at home and took care of her.
He had spent considerable money about the place, and that
was the only chance she had of re-paying him—to give him
the property. From her conversation at the conference he
was of the opinion that she fully understood the business
on hand that she was doing. He afterwards drew the deed
which was executed at the Proviso State Bank, in May-
wood. After it was drafted she read it and said it was all
right. When it was executed those present were Dr. Miller,
the dentist, Heller and Holden. Mrs. Mensior, the notary,
was present at the execution of the deed and took Mrs.

330—8

Keun's acknowledgment. Her testimony is substantially the same as the testimony of Holden and Ross.

The maintenance of the decree rendered in this case rests principally upon the testimony of witnesses directly interested financially in the result, clearly hostile to appellant, and upon the testimony of the expert in psychiatry. The situation presented is not dissimilar to that in *Bordner* v. *Kelso*, 293 Ill. 175, and *Crosby* v. *Dorward*, 248 id. 471, so far as the contestants are involved. In the latter case it was said: "The evidence of some of the witnesses who testified that Crosby was not competent to transact ordinary business is weakened by the fact that they transacted business with him and admitted that he seemed to understand what he was about." The analogy arises out of the fact that when Keun had been seriously injured, was in the hospital on account of his injuries and his death imminent, those now complaining permitted Mrs. Keun, with no word of protest or intimation of incompetency, to mortgage the property to provide money to defray expenses attending his illness and death. They agreed to the making of the mortgage at a conference at which they were all present. They account for their silence and acquiescence by saying it was necessary to get the money.

Beginning as far back as 1862 this court in *Lilly* v. *Waggoner*, 27 Ill. 395, said: "The legal presumption is that all persons of mature age are of sane memory, but after inquest found, the presumption is reversed until it is rebutted by evidence that he has become sane. When the transaction complained of occurred before the inquest is had, the proof of insanity devolves upon the party alleging it, but it is otherwise if it took place afterward." In *Titcomb* v. *Vantyle*, 84 Ill. 371, Vantyle, upon complaint and trial had in the county court before a jury, was found to be insane. The court said: "Prior to this finding the legal presumption obtained that Vantyle was sane. The legal presumption is that all persons of mature age are of sane memory. This

presumption continues until inquest found. Then, perhaps, the presumption may be regarded as reversed until it is rebutted by evidence that sanity has returned."

The evidence fails to show Mrs. Keun was incompetent to make the deeds. When her husband, the father of the children now complaining, was in the hospital it was necessary to provide money to pay the hospital bills and expenses attending his expected death. She and Lawrence went to the bank to get the loan. Holden, vice-president of the Proviso State Bank, knew her and Lawrence and knew her husband. He had known her a long time. She often went to his bank and always went alone. He met her at the grocery store and the butcher shop many times. He often met her on the street and "bid her the time of day." He had no reason to doubt her competency to execute an instrument. No question was raised by any member of the family about her competency and the business she would be about in the transaction of the trust deed or mortgage and the notes. At the first trial to have her adjudged a distracted person she testified. She went upon the witness stand unaided and made a good witness. Ross regarded her "extremely keen," considering her age. There is nothing in the record, by way of interest or manner of testifying, impeaching the evidence of the witnesses who testified to her mental capacity to transact actual business. Mrs. Harper, the gynecologist; Miller, the dentist; Heller, the merchant; Ada Lancaster, who had known her for more than thirty years; Ross, the attorney; Mrs. Heller, who had known her for more than twenty years; Holden, the banker, who often met her and talked with her; Clara Adams, not of kin and disinterested; Green, who often visited at her home; Eleanor Mensior, the notary; Daimehl, the coal and ice man; Wood, the insurance adjuster,—none of them interested directly or remotely,—show that she had sufficient mental capacity to make the conveyance and to know what she was doing and why she was doing it. They corroborate

the testimony of Charlotte Wilhite, a grand-daughter, of J. E. Wilhite, her husband, a police officer, and of Rudolph Keun, a son, as to her competency. Nothing in the evidence discloses any interest that ought to weaken the testimony of either or any of them. None of them had meddled in Mrs. Keun's affairs before or after her husband's death.

The effect of trial by jury in will contests and in cases of the character of the one now before the court is marked by the different functions of the jury in the cases. In the case at bar the question of competency of the grantor is for the chancellor. It is purely an equity case, resting upon equitable principles and governed by equity procedure. In a will contest the procedure is governed by legal principles so far as the jury trial is involved. The verdict is not advisory but binding on the court if error has not intervened or the verdict clearly against the weight of the evidence. In cases like the one at bar the chancellor may formulate issues to be determined by the jury, but the jury's determination is merely advisory and may be disregarded. The chancellor in this case seems to have emphasized this fact in the decree. Neither the circuit court nor this court is concluded by the finding of the jury. It is no more binding upon this court than upon the trial court. If upon a full consideration of the evidence this court is of the opinion the finding and decree are not in accordance with the facts the decree will not be allowed to stand. *Decker* v. *Decker,* 324 Ill. 457, and cases cited.

When, several months after the making of the deeds, an inquest was had and Mrs. Keun was then found incompetent, the finding could relate only to her mental condition at that time. The conservatrix appointed on that finding filed her bill to avoid the deeds.

Singularly, the court made a finding in its decree that from a personal examination of Mrs. Keun in open court during the trial "she was at that time so impaired mentally that she does not even know her maiden name, her age, the

number and names of her sons and daughters; that she is *now* wholly incompetent to know or understand any of the ordinary business transactions of life; and the court, taking into consideration the testimony of the physician who was called upon to testify as to the mental condition of Christiana Keun, finds that she is *now* suffering from a very advanced stage of senile dementia and that it is a progressive disease; that the mental condition of senile dementia found upon an examination made of her nineteen months after the execution of the deeds in question by the physician, as he clearly pointed out, must, in the very nature of things, have existed for several years prior thereto in such a stage that the said Christiana Keun could not have understood or comprehended the business transactions in question, and that there is some conflict in the testimony between the witnesses called by the plaintiff and the defendant, respectively; that there is an abundance of evidence conclusively showing that she at the time of the execution of the deeds, and for a long time prior thereto and since, was and is incompetent to comprehend, know and understand the nature of the business in question, to-wit, the transfer by deeds of all the real estate which she owned and possessed, including her home, to her son Lawrence."

Much reliance seems to be placed by appellee on this finding as to the value of the doctor's testimony. This court has placed a different value on the testimony of physicians in similar matters. The latest view of the court on this subject is found in *Sharkey* v. *Sisson,* 310 Ill. 98, a case similar, in many respects, to that now under consideration. The alleged mental disqualification for making a deed was senile dementia. The testimony of physicians seems to have been relied on by those seeking to set aside the deed, and by the trial court without the aid of a jury. Five physicians testified that in their opinion the grantor was incompetent to make the conveyances in question, and they were decreed to be nullities on account of the grantor's mental condition.

It was there said: "The doctors were better qualified to testify as to the diseased condition of Morris [the grantor] than lay witnesses and to state the effects of the disease, but it was held in *Austin* v. *Austin,* 260 Ill. 299, and *Carpenter* v. *Calvert,* 83 id. 62, and other cases, that the testimony of physicians upon the subject of mental capacity is entitled to no greater weight than that of laymen of good common sense and judgment. The condition of Morris which the doctors testified existed at the time of the trial was more than a year after the deeds were made. None of them testified as to his condition when the deeds were made, but from their examination of him just before the trial, and what some of them had seen of him before the deeds were made, they expressed the opinion he was not capable of making the deeds. None of them talked to him about his business or property. Some of them thought he knew how much property he had, and his relatives, and that he might be able to understand a deed if it was explained to him, but they expressed the opinion that he was not mentally capable of transacting business." In *Austin* v. *Austin, supra,* (a will contest,) none of proponents' important witnesses were physicians, while four of the five important witnesses for contestant were physicians. On that state of the case the justice who wrote the opinion in the *Sharkey case* said: "The opportunities of proponents' witnesses for observing Mrs. Corkery's mental condition were much better than those of any of contestants' witnesses, with the exception of Dr. Pigall. Unless, therefore, it is to be said that the testimony of the medical witnesses who testified on behalf of the contestants is entitled to greater weight than the testimony of non-medical witnesses, it must be held that the weight of the proof is in favor of the proponents. It has never been held in this State that the testimony of doctors upon the subject of mental capacity is entitled to any greater weight than that of laymen who are men of good common sense and judgment. In *Carpenter* v. *Calvert,* 83 Ill. 62,

it is said: 'Physicians may be regarded experts as to the condition of the body and as to what diseases tend to impair the mind, but it does not follow from the mere fact that they are physicians that they are any better judges of the degree of mental capacity than other men of common sense.' " See, also, the vigorous language of Mr. Justice Breese in *Rutherford* v. *Morris, 77* Ill. 397.

In view of the evidentiary value of such expert testimony announced in the decisions quoted and in many others, the finding by the court based upon it cannot be sustained. The fact is not unobserved that the expert is a psychiatrist, but he is dealing in speculation just the same. His testimony is not in harmony with that of practical and trustworthy witnesses who testified to Mrs. Keun's sound mental condition from actual observations at and immediately before and after the deeds and the mortgage were executed. Interested parties stultified themselves when they testified she was not competent, yet admitted that they stood by and acquiesced in her placing a mortgage on part of the property only a short time before the deeds were made. Mrs. Wannacott, one of the daughters now complaining, testified that at her mother's home it was agreed by all the brothers and sisters that the mortgage should be placed on the property. This was before their father died. The reason they assign for silence when she made the mortgage is, it was necessary to procure the money to take care of their aged and invalid father, but if, as they say now, they knew she was then incompetent their mouths are closed to assert her incompetency. They come into a court of equity for relief and must come with clean hands.

The burden was on the complainant to prove the allegation of incapacity of the grantor to make the deeds now challenged. The evidence clearly shows the grantor was mentally capable of understanding the transactions in which she was engaged when she made the deeds. They were made in harmony with her declared purpose to make them.

These declarations were relevant to the issue. (*Sharkey v. Sisson; supra.*) Her son Lawrence had stood by her when the complainant and some of her other children had left her. They had contributed nothing to her support. The evidence shows that the taxes, special assessments and other charges on the property had been paid by him. The unsuccessful proceeding to have her adjudged incompetent soon after the death of her husband was in line with their previous neglect of her. Senility, and even partial impairment of her mental faculties, are not ground for setting aside the deeds if she had sufficient mind and memory to comprehend the nature and effect of the transactions and to protect her own interest. *Decker v. Decker, supra; Sharkey v. Sisson, supra; Bordner v. Kelso, supra; Crosby v. Dorward, supra; Campbell v. Freeman,* 296 Ill. 536; *Sears v. Vaughan,* 230 id. 572; *Hoelscher v. Hoelscher,* 322 id. 406.

From a consideration of the whole record we are clearly of the opinion that the evidence does not justify the decree. It is therefore our duty to reverse it. *Decker v. Decker, supra; Burandt v. Burandt,* 318 Ill. 218; *Sharkey v. Sisson, supra; Bordner v. Kelso, supra; Smith v. Kopitzki,* 254 Ill. 498.

The decree of the circuit court is reversed and the cause is remanded to that court, with directions to dismiss the bill for want of equity.

Per CURIAM: The foregoing opinion reported by Mr. Commissioner Crow is hereby adopted as the opinion of the court, and judgment is entered in accordance therewith.

*Reversed and remanded, with directions.*