WALTER J. KASBOHM *et al.* Appellees, *vs.* BEATRICE M. MILLER *et al.* Appellants.

*Opinion filed June 11, 1937.*

CASTLE, OSBORN & HALLETT, (HARPER E. OSBORN, and ALBERT E. HALLETT, JR., of counsel,) for appellants.

PINES, STEIN & BEBER, and ALFRED BROADY, (ALVIN E. STEIN, of counsel,) for appellees.

Mr. JUSTICE HERRICK delivered the opinion of the court:

This cause is brought here by appeal from a decree of the circuit court of Cook county setting aside two warranty deeds made by Frederick H. Kasbohm (hereinafter referred to as Kasbohm) on April 22, 1926, one being to his son, George J. Kasbohm, and the other to his daughters, Anna M. Glave and Beatrice M. Miller. The evidence was heard by the master on a second amended and supplemental bill of complaint in equity filed by five of the grantor's sons against the grantees. The charges made were that the deeds were obtained through unlawful conspiracy, fraudulent inducements, improper restraint, undue influence and other like misconduct, and that the grantor, at the time of their execution and delivery, was mentally incompetent. Eighteen witnesses for the complainants testified before the master and nineteen for the defendants. The master made his report specifically finding, from a preponderance of the evidence, that at the time the deeds were executed and delivered, the grantor had sufficient mind and memory to comprehend the nature and effect of the transactions and to protect his own interests. He found the weight of the evidence was against the complainants on all the issues. The chancellor entered a decree for the complainants.

In view of the conclusion we have reached, a review of the evidence becomes necessary. The grantor had for more than thirty years been a fireman attached to the fire insurance patrol, in Chicago. He attained the rank of captain and retired, in 1921, on a pension of $137.50 per month. At the time he withdrew as a fireman he owned a two-story frame building located at 2648 Warren avenue, Chicago, (hereinafter referred to as the Chicago property,) which rented at $41 per month; also a stucco bungalow residence property where he lived, in DesPlaines. After his retirement the grantor continued to live in the Des Plaines property with his wife. Living with them at the time were his son George J., his daughter Beatrice M. Miller and her husband and their two children. In February, 1925, his wife died. Almost immediately thereafter ill feeling developed among members of the family, largely arising from financial questions such as the division of the deceased wife's property, the accounting of rents collected for her by her son Albert, the disposition of household goods, the right of Beatrice Miller, the youngest daughter, and her husband, to live in her father's home, funeral expenses and insurance funds. The controversy over these subjects grew in bitterness among the children. Their father made statements indicating he thought the complainants were trying to take advantage of him and that one of them had taken some of his wife's household goods after her death, and before her funeral, without consulting his wishes. He apparently bitterly resented the attitude and conduct of at least some of the complainants toward him. From 1921, Mr. Kasbohm's eyesight had been failing until before his death he became almost blind. He found difficulty in getting about on that account. Soon after the death of his wife he called his attorney, Ning Eley, then a master in chancery of the circuit court of Cook county and a neighbor of Kasbohm's, and instructed him to prepare a will by which he left his property to all his eight children on an

equal basis. On April 19, 1926, one of the complainants, Walter J. Kasbohm, filed his sworn petition in the probate court of Cook county alleging his father was feeble-minded and praying for the appointment of a conservator. Summons issued on that date but was not served until ten days later. Kasbohm heard of this action the next day. On that same day he saw his attorney, Ning Eley, informing him that he understood "the boys in Chicago" had started a proceeding to have a conservator appointed for him. He further stated he did not want them to have any of his property and requested his attorney to prepare deeds conveying the Chicago property to his son, George, and the DesPlaines property to his daughters, Mrs. Miller and Mrs. Glave.

Eley testified he thought either Mrs. Miller or Mrs. Glave telephoned him to come to Kasbohm's house on this occasion, and that he believed both daughters were at the house when he arrived, but his interview was with Kasbohm alone. He did not talk to either of the daughters about the contemplated business before the deeds were prepared. On receiving the above information from his client and surmising the deeds might later be attacked by "the boys," Eley conversed with and questioned Kasbohm at length, and then formed the positive opinion, from such examination, that his client was of sound mind and memory, knew just what he wanted done, knew all the members of his family and appeared to be perfectly capable of transacting his business. Eley then examined the probate court records, prepared the deeds bearing date of April 22 in accordance with Kasbohm's direction and delivered them to him. In order to have an additional witness to the grantor's mental capacity in the execution of the deeds, Eley advised the grantor to acknowledge them before Martin A. Behrens, a notary public who was a next door neighbor of Kasbohm's.

Behrens was an assistant cashier at the bank where the grantor did his banking and had known him for several years. On the evening of April 26 the notary went to the grantor's home for the purpose of taking the grantor's acknowledgment. It is not clear whether Mrs. Miller, Mrs. Glave, and George J. Kasbohm were in the room with the grantor at the time, but, if so, they took no part in the ensuing conversation relative to the deeds. Kasbohm requested the notary to take his acknowledgment. Behrens first read the deeds and then, as he stated his custom was, questioned the grantor at length, among other things asking whether he knew the instruments were deeds to his property, whether he understood he was conveying his property to his son George and to his daughters, whether he knew that if he signed these deeds he would lose all title to these properties and whether the signing of the deeds was his free and voluntary act. The grantor answered all these questions in the affirmative. He was then asked by the notary if anyone had used any persuasion to get him to make the deeds and he answered, "No." The grantor then signed and acknowledged the deeds in Behrens' presence. The deeds were filed for record on April 29. Soon thereafter, Kasbohm moved from the DesPlaines residence to the home of his daughter, Mrs. Glave, where, except for short visits with his other daughter, Mrs. Miller, he continued to live until his death about two years later.

The record further shows that before the summons in the probate court proceedings was served on Kasbohm, arrangements were made with David Greenberg, an attorney for the Yellow Cab Company, by whom the husband of Mrs. Miller had formerly been employed, to defend these proceedings without charge. After the summons was served on him, Kasbohm went to Greenberg's office. These parties were then strangers to each other. They talked with each other alone. Kasbohm told Greenberg of the pending proceedings against him, stated his age, spoke of

his failing eyesight, named each of his six sons and two daughters and gave their respective residence addresses, spoke of his relations with each of them, described his properties in detail, including their value and location, and said he had done what he could to raise his sons properly and educate them but that they had played him a "dirty trick." He further related they had filed a petition to have him declared incompetent in order that they might get control of his property; that he resented their actions and, with the intention to cut them off completely, he had deeded his Warren avenue property in Chicago to one of his sons and his DesPlaines property to his two daughters. He asked Mr. Greenberg to talk to the grantor's physician, naming him, and arrange to defend the action in the probate court. He later saw and conferred with his attorney alone, three or four times before the trial.

Greenberg also testified that at the trial in the probate court, which began June 16, 1926, Kasbohm sat with him, recognized and identified the various witnesses by their voices, gave his attorney their names and told him what they would testify to. Greenberg stated, in the instant suit, that on the hearing in the probate court he asked Kasbohm his business and he replied he was a retired fireman, asked him if he knew what sort of proceedings were then pending, and he said he did. When asked to describe the property he owned, of what it consisted, who were his children, Greenberg testified that Kasbohm answered all these questions intelligently, said he knew he conveyed his property to certain of his children and gave his reasons for doing so; that he talked slowly but always gave correct answers to questions asked him.

On June 17, the jury returned a verdict finding Kasbohm to be feeble-minded and incapable of managing and controlling his estate, that he had been in such condition about fifteen months prior to the hearing and that he was aged about seventy years. Four or five witnesses testified

for the petitioners at the hearing, three of whom are complainants here and one was a very close friend of one of the complainants. . A conservator was later appointed. On June 15, 1928, the conservator filed the original bill in this cause. After the death of the ward on August 27 of that year, the present complainants were substituted. Several close acquaintances and relatives of Kasbohm testified for the defendants on the hearing before the master, detailing various matters they had noticed in their observation of and dealings with, or conversations with, the grantor. Most of these witnesses had known him intimately over a period of years and had good opportunity to observe and talk with him. Their testimony covered principally the period from the death of Kasbohm's wife in 1925 to a few weeks before his death in 1928.

The substance of their testimony was to the effect that his eyesight was failing; that he could see fairly well on bright days, especially when outdoors, but could not see nearly so well on dark days; that he always fed himself and used a knife, fork and spoon, but sometimes a member of the family would cut his meat if it was tough; that he recognized and greeted friends and relatives, called them by name at sight and usually inquired about other friends not present; that with the aid of a reading glass he read newspapers, but not for any extended length of time; that he always conversed intelligently on general subjects and the current topics, inquired of each of his friends about his business, talked some politics and told of some of his experiences as a fireman. He frequently signed his name. He endorsed his pension checks and wrote some letters. He knew when his grandchildren, or the children of his close friends, were ill, and expressed concern for their well-being. He walked about his premises and in the house, alone, and to a nearby store for his tobacco, but was usually accompanied by someone when he walked any considerable distance from his home. He usually remembered

recent as well as past events. He spoke to different people about his boys taking him into court to prove he was feeble-minded and said, "They want to make a homeless Hector out of me,"—that they wanted him to drift from one to the other and that he did not want his boys, other than George, to have any of his property when he died. He complained about his failing eyesight but thought an eye specialist at Niles, Michigan, whom he went to see once a month, was benefiting him more than any previous treatments he had received. He warned a neighbor mother about her girl playing with a boy whom he had heard use bad language. A neighbor woman was at Mrs. Glave's home talking to her and Kasbohm in June, 1927. She heard Mrs. Glave mention that a doctor's car was then next door at her brother Frank's. Kasbohm remarked that for all the trouble Frank had caused him he was getting some in return.

Dr. Poyer, a dentist who lived close to Kasbohm's, testified that at different times from April, 1925, to some time in January, 1927, he had pulled some teeth for him. On these occasions Kasbohm always came to his office, told him what he wanted and discussed general subjects intelligently; he saw him frequently about his premises and thought Kasbohm always knew at all times exactly what he wanted and what he was doing. The witness never noticed any failure of his memory. Some of these witnesses expressly denied the truth of much of the testimony of the complainants and all stated that they thought Kasbohm was at all times of sound mind and memory and capable of transacting his business.

Much of the evidence for the petitioners indicating unusual conduct on the part of Kasbohm may be attributed to his poor vision, and his later conduct may be explained by his feelings toward the complainants induced, as he believed, by their previous unfilial attitude toward him and meddling in his affairs. From the testimony of witnesses

for the complainants it appears that once or twice Kasbohm put his shoes on the wrong feet, on one or two other occasions he had put his trousers on wrong side front, sometimes the lower portion of his shirt showed; he did not recognize certain people to whom he had been recently introduced and denied having met them. He sometimes hunted for his glasses when he was wearing them and for his pipe when it was in his hand. Sometimes he did not talk to a chance acquaintance. Occasionally he sat for from two to four hours without seeming to do or see anything. In 1924, Kasbohm's wife complained to her son Albert that he was getting to be a big burden and she had to keep him tied to her apron strings. While at Grass Lake, early one fall, a son found him fully dressed standing in a foot of water and when asked what he was doing there, he replied, "I don't know. What kind of a road is this?" In August, 1925, he became lost in the vicinity of a son's store. Sometimes he soiled himself when using the toilet. He frequently looked "stary-eyed" according to some witnesses. He declined to join in conversation sometimes when spoken to. His wife said she had to watch him or he would get lost. Frequently his food had to be cut up for him and he had to be fed.

From March 23 to March 29, 1925, he was a patient in the Lutheran Memorial Hospital where he had been taken for observation. Dr. Howard E. Simkin, who was then serving an interneship there after graduating from medical school the preceding year, examined Kasbohm and kept the hospital record relative to his case. He testified that Kasbohm was indifferent to his surroundings, did not know what he was in the hospital for, did not answer questions definitely and wanted to be left alone; that he often made contradictory statements, did not talk but lay there staring. He also testified Kasbohm could remember occurrences twenty-five years previous, but not recent events. The case hospital record in the handwriting of Dr. Simkin shows

that he had diagnosed the case as senile amnesia but that the attending physician, Dr. Bartholomew, who died prior to the hearing, changed the diagnosis made by Dr. Simkin to recite that the patient was suffering from cerebral arteriosclerosis, which Dr. Simkin said means thickening and hardening of the blood vessels of the brain. He stated it is a condition that is incurable, progressive and results finally in a complete loss of memory. It was his opinion that Kasbohm was not of sound mind and memory.

Mrs. Marie Hajeck, a sister-in-law of complainant Frank Kasbohm, testified she was present at the hearing in the probate court and that Kasbohm did not get up when called to the witness stand. That Mr. Miller had to help him to the stand; that when testifying he was confused, did not know how many children he had, could name only one or two, did not recognize his children in the court room and did not know where his property was. Two of the jurors who served on the jury at the probate court hearing seven years previously, were called by the complainants and the substance of their testimony was that Kasbohm on that occasion was very much upset and unnerved, frightened and unhappy; that his demeanor, however, was quiet; that when asked about the location of his property he said it was in DesPlaines and one was on Warren avenue but did not give the numbers. He said he had conveyed the property on Warren avenue to his son George because he was good to him and took him automobile riding; that he was mixed about what was done with the other property; that his eyesight was very poor and he apparently could not see well in the court room; that he was assisted to the stand. One said he was asked if he recognized his children; that he named his two daughters and when asked where the other children were he shook his head. The other witness said he was asked how many children he had and to name them and that he either did not name them at that time or had a difficult time doing it.

Complainants Albert and Walter Kasbohm testified they learned their father had changed the beneficiaries in his insurance policies to George, Mrs. Miller and Mrs. Glave. They spoke to him about it and their father said: "They told me there wasn't any more room on the paper for any more names."

Some of the complainants testified that at different times, in 1925 and 1926, they wanted to take their father to their homes or out to the country but the daughters, on various pretexts, refused permission. Walter and Albert Kasbohm said they tried to see their father alone at different times, but were never permitted to do so.

Three letters written by Mrs. Glave, the grantor's oldest child, to her brother Fred and his wife in California during the early part of 1925, were introduced in evidence. These indicated she then thought her father's eyesight was very poor, that he could not see over ten or twelve feet away, that he had been examined by a physician and was taken to a hospital for observation, that he would sometimes sit three or four hours in one place without moving and usually spoke only when spoken to, and suggested that Fred come home for a visit to see his father as he might not live long. One letter also stated the advice of his attorney was asked about having someone look after his affairs but that the attorney stated Kasbohm did not need anyone for that purpose. These letters further criticized the conduct of her brothers, Walter, Albert and Frank, after her mother's death, especially relative to financial matters. She wrote that while her mother was still on a stretcher, her brother Walter asked for, as he said, his army blankets. Albert's wife wanted to know what they intended doing about her jewelry. The undertaker and cemetery agents were acquainted with George and inquired whether he was to pay the bills himself or whether his brothers and sisters would help. It was not then known how much personal property her mother had. The family

met and talked it over. Albert became angry and said Kasbohm should pay these bills. If he could not, he should mortgage the home to raise the money. George replied he would personally pay the bills before he would permit his father to mortgage his home. When they went to the bank there were found stocks, bonds and currency amounting to considerably more than the funeral and burial expenses. It was the suggestion of a banking officer that George put all the personal property and title papers under his name in the vault, so as to guard against his father being defrauded. She also further wrote that Albert wanted to buy "for a song" the property he lived in, which was owned by his mother, and that someone had to go with her father to the bank and also to collect his rents. Two short letters written by Kasbohm to his son Fred were also in evidence. The letters composed by him were clear and intelligent but they show some words missing and some words illegibly written.

Practically all the evidence on the question of undue influence on the part of the grantees to secure the deeds from the grantor was the testimony of complainants themselves and consisted largely of statements indicating that Kasbohm's daughters would not let him visit the complainants and would not permit them to talk to him alone, and matters of that character. Some of the complainants testified that on certain occasions some one or more of the defendants made statements, in the presence of Kasbohm, accusing some one or more of the complainants of scheming intentions to secure Kasbohm's property or the control of it.

Fred Dicks, a witness for the complainants, who lived for some time across the street from Mrs. Glave and who was a friend of her son and in her home frequently, stated he often heard Mrs. Glave complain before her father of certain acts of some of her brothers relative to family money matters. He also said that Kasbohm usually talked about his past experiences in the fire department, although

ordinarily he was not very communicative. This witness stated Kasbohm occasionally spoke about the complainants, and, in 1927, told him he did not want to have anything to do with them any more and that he disowned them.

It also appears from the evidence that Mrs. Glave regularly took her father to Niles, Michigan, for treatment by an oculist there, and that she paid for his clothes. Kasbohm stated to Fred Dicks that he would rather live with Mrs. Glave than with any of his other children.

A careful reading of the record shows there is no direct evidence whatever that the deeds were made by reason of any fraud or any undue influence practiced by the grantees, or any of them, upon their father, or that he was not mentally competent on the day the deeds were executed. The testimony of the attorney, Ning Eley, and of the notary, Martin A. Behrens, relative to the preparation and execution of the deeds and the facts leading up to that transaction establishes, if their testimony is to be believed, that he then possessed sufficient mind and memory to initiate, and complete intelligently, that transaction. These two witnesses were not related to any of the parties and were men of ability and standing in the community. The opinions expressed by many of the witnesses for the complainants on the subject of the condition of the grantor's mind and memory are of little value because the opinions stated are clearly based upon inadequate opportunity for observation and do not form a sufficient basis for determining his mental strength and therefore carry little weight. There is no evidence whatever that the grantees ever requested or in any way sought to influence their father to make the deeds.

To hold that the act of executing and delivering the deeds was not Kasbohm's own voluntary one would be an inference without legal support in the evidence. The test of mental capacity to make a deed is that the grantor must have sufficient mental strength to comprehend the nature

and effect of his act and be able to cope with his adversary. (*Sharkey* v. *Sisson,* 310 Ill. 98; *Wagner* v. *Chicago and Alton Railroad Co.* 265 id. 245; *Greene* v. *Maxwell,* 251 id. 335.) Impairment of memory by reason of advanced years does not of itself indicate lack of mental power to understand a transaction and to dispose of property. (*Sears* v. *Vaughan,* 230 Ill. 572.) Neither old age, eccentricity nor even partial impairment of mental faculties is necessarily sufficient to set aside a deed. If the grantor had sufficient mental capacity to comprehend the nature of the transaction, the effect thereof and to protect his own interest, the deed will not be set aside for want of mental capacity. (*Hoelscher* v. *Hoelscher,* 322 Ill. 406; *Essary* v. *Marvel,* 274 id. 576; *Crosby* v. *Dorward,* 248 id. 471; *Kelly* v. *Nusbaum,* 244 id. 158; *Sears* v. *Vaughan, supra.*) Undue influence which will void a will or a deed must go to the extent of depriving the party of his free agency and such influence must operate at the time of the transaction sought to be impeached. (*Smith* v. *Kopitzki,* 254 Ill. 498; *Wilcoxon* v. *Wilcoxon,* 165 id. 454; *Francis* v. *Wilkinson,* 147 id. 370; *Sears* v. *Vaughan, supra.*) The mere fact of relationship of parent and child does not, where the parent is the grantor and the child is the grantee, raise any presumption of undue influence, (*Smith* v. *Kopitzki, supra; Hoelscher* v. *Hoelscher, supra,*) and in such case there must be proof of fraud or undue influence, in fact, in order to void the deed on those grounds. *Sears* v. *Vaughan, supra; Hoelscher* v. *Hoelscher, supra.*

The evidence relied upon by the complainants to sustain the decree is, in great part, from witnesses interested in the result of the suit, and upon the testimony of Dr. Simkin. The testimony of medical witnesses upon the subject of mental capacity is entitled to no greater weight than that of laymen who are men of good common sense and judgment. *McGregor* v. *Keun,* 330 Ill. 106; *Austin* v.

*Austin,* 260 id. 299; *Carpenter* v. *Calvert,* 83 id. 62; *Sharkey* v. *Sisson, supra.*

Considerable reliance, apparently, has been placed upon the finding of the jury at the incompetency hearing, and especially that part thereof finding Kasbohm to have been of unsound mind for a period of about fifteen months prior to the hearing. The deeds, as above stated, were executed about two months prior to the hearing in the probate court. The presumption of law, before inquest found, is in favor of sanity, and the burden of proof is upon the party alleging insanity. *Titcomb* v. *Vantyle,* 84 Ill. 371; *Lilly* v. *Waggoner,* 27 id. 395; *McGregor* v. *Keun, supra.* The record does not show that any fiduciary relationship existed between the grantor and the grantees. The burden was on the complainants to prove the charges made. *McGregor* v. *Keun, supra.*

The master, who saw and heard the witnesses testify, found for the defendants. The chancellor, without hearing further evidence, sustained exceptions to the master's findings of facts. The applicable rule is, that as to the controverted facts, the master's findings do not carry the weight of a jury verdict in a suit where a trial by jury is a matter of right, yet such finding is advisory. (*Stasch* v. *Stasch,* 355 Ill. 581; *Thatcher* v. *Kramer,* 347 id. 601.) All the facts in a case such as this are open for consideration by the chancellor and by a court of review. The chancellor in this case had no better opportunity to judge the credibility of witnesses than has the reviewing court on appeal. (*Stasch* v. *Stasch, supra; Thatcher* v. *Kramer, supra; Mallinger* v. *Shapiro,* 329 Ill. 629.) In our opinion the greater weight of the evidence discloses that the grantor at the time the deeds were executed was mentally capable of understanding the nature thereof and the effect of making them. The evidence in the record is not sufficient to establish the allegations of the complainants' amended and supplemental bill. It is our duty, therefore, to reverse the decree.

The decree of the circuit court of Cook county is reversed and the cause is remanded to that court, with instructions to enter a decree in conformity with the views herein expressed.

*Reversed and remanded, with directions.*